OPINION OF THE COURT
Walter J. Relihan, Jr., J.
The plaintiff, a tenured member of the Ithaca College faculty, was demoted from full professor to associate professor, reduced in salary, and given restricted academic duties following an investigation which led the College to conclude that he had been guilty of serious professional misconduct.
Plaintiff reluctantly accepted the demotion but reserved his right, under College rules, to file a grievance which would permit a peer review of his case. Later, however, plaintiff elected not to pursue a grievance and brought an action at law which asserts three causes of action: breach of contract, intentional infliction of emotional distress and prima facie tort. The defendant College moves to dismiss the complaint.
Plaintiff was advanced, with tenure, to the ranks of associate professor and full professor in 1973 and 1985 respectively. However, under College rules and procedures, appointments to "tenure” remain subject to annual renewal. The rules further provide that, unless the parties come to agreement on the terms of the annual offer of renewal, the employment relation terminates. Hence, the College continued to send him an offer, in the spring, stating his rank and salary for a term to begin on August 15th and ending the following May 31st.
The issue which precipitated the College’s offer of a devalued renewal contract for 1994-1995 was a finding that plaintiff’s 1983 book, "Evolution of Film Styles”, had plagiarized other books and articles. The publication of his book had been a major positive factor in the plaintiff’s 1985 promotion. The charges were submitted to the Dean of the School of Communication, in November 1993, by two professors in the plaintiff’s department of Cinema and Photography). Their memorandum cited *461 the extensive use of text from several books and articles, often in haec verba, and sometimes in close paraphrase. None of these borrowings were acknowledged by the plaintiff in his book. Upon review, the Dean and Provost concluded that, indeed, Klinge was guilty of plagiarism.
The defendant is a private institution and not a State actor (Rendell-Baker v Kohn, 457 US 830). Hence, the plaintiff enjoys no constitutionally protected liberty or property interests in continued employment which could be asserted against the College (Board of Regents v Roth, 408 US 564; Perry v Sindermann, 408 US 593). The plaintiff’s rights, therefore, must be sought in the College contract of employment and the law of New York which recognizes that an employer may surrender or qualify its unfettered right to terminate an employee at will by terms and conditions, found in a personnel manual or handbook, which are expressly made a part of the contract of employment (Sabetay v Sterling Drug, 69 NY2d 329; Murphy v American Home Prods. Corp., 58 NY2d 293; Weiner v McGrawHill, Inc., 57 NY2d 458).
The College published a Handbook which recites that tenured faculty will be renewed until age 70, subject to terms and conditions found elsewhere in the manual, and that tenure is a "long term obligation” of the institution. The usual qualifications surrounding the concept of tenure are found in the manual, including dismissal for "cause”.
At the threshold, defendant argues that the rules found in the Handbook were not incorporated in the plaintiff’s 1993-1994 contract of employment and, hence, were not binding upon the College. In every prior year, however, the offer of renewal was delivered to the plaintiff in the form of a single sheet of paper which contained the offeree’s name, rank and new salary. In each case, a footnote appeared on the sheet which recited: "This appointment is made in accordance with and is governed by the policies of the Board of Trustees as published in the Ithaca College Faculty Handbook and acceptance of the appointment includes acceptance of the policies embodied in this Handbook.”
During those years, without doubt, the Handbook rules were incorporated by reference in the contract and were binding upon the College (Rosen v Vassar Coll., 135 AD2d 248, 250-251). The 1993-1994 offer to plaintiff did not contain that footnote. However, the College concedes that: "it did advise faculty in cover letters which accompany new appointment forms that the appointment was made subject to the terms of the Faculty *462 Handbook and other rules and policies of the College.” (Provost affidavit para 6.) Given the unequivocal assurance found in the 1993-1994 cover letter, as described by the Provost, the conclusion is inescapable that the 1993-1994 contract continued to incorporate the Handbook provisions on the renewal of tenured faculty members and faculty discipline.
Assuming, arguendo, that the absence of the 1993-1994 footnote in the renewal offer was not fully remedied by the presence of similar language in the cover letter, we would reach the same conclusion based on the "totality of circumstances” test endorsed by the Court of Appeals in Weiner v McGrawHill, Inc. (57 NY2d 458, 467, supra). The 1993-1994 renewal offer, like its predecessors, contained only the bare bones of the employment contract and would not be regarded by the College, or its professoriat, as reflecting the totality of the mutual commitments of the parties. Under such circumstances, a court may take notice of implicitly accepted customs and practices to fill the gaps and, thereby, to allow the actual intentions of the parties to be fully understood (Greene v Howard Univ., 412 F2d 1128, 1135; Kaplin, Higher Education, §§ 3.1.1, 3.1.2 [2d ed]; 3 Corbin, Contracts § 562; 22 NY Jur 2d, Contracts, § 204). We recognize, however, that these conclusions draw heavily upon contract law and that the Weiner doctrine is driven as much by history and policy as other considerations.
The most recent addition to the Weiner corpus (Matter of De Petris v Union Settlement Assn., 86 NY2d 406, 410) declares that: "[A]n employee may recover * * * by establishing that the employer made the employee aware of its express written policy limiting its right of discharge and that the employee detrimentally relied upon that policy in accepting the employment”. No mention is made of a "totality of circumstances” test but the facts in the case required no such analysis. Presumably, a court may continue to heed the conduct of the parties, their writings, their prior negotiations and " 'the totality of all these’ ” (Weiner v McGraw-Hill, Inc., supra, at 466-467) in reaching a conclusion.
Assuming, however, that De Petris (supra) signals that no totality of circumstances will suffice unless it includes the "detrimental change of position in reliance” factor, the plaintiff appears to have met the test. Klinge states, in an affidavit submitted on the motion, that "when I considered other possible career opportunities and options, my final decision to stay at Ithaca College was largely a product of the job security provided by my position as a tenured Professor, and by my *463 rights, under the Faculty Handbook, to continued employment until the age of 70”.
The Ithaca College system, treating tenured and nontenured faculty members as equally subject to annual renewal, departs from preponderant practice but offends no law. It does, however, present a potential problem of interpretation, assuming that all parts of an integrated agreement should be given effect where possible. The Handbook, on the one hand, represents that tenured faculty will be renewed until age 70 and, on the other, declares that a failure of an offeree to accept the terms of a proffered renewal will end the employment relation. In an extreme case, the unfettered power to control the terms of an annual renewal offer could be used to end the "long term obligation” owing a tenured professor, without cause.
In any event, the present case does not involve a refusal by the defendant to renew a tenured professor without a prior finding of good cause. The College offered a renewal with no loss of tenured status and no diminution of the plaintiff’s contractual right to file a grievance. Clearly, no college is required to perpetuate and even improve salaries or benefits each year, simply because the incumbent is tenured, and no tenure system is proof against demotion upon good cause shown (1 Rapp, Education Law § 6.06 [2] [a]).
The question, rather, is whether the rules, regulations and policies found in the Handbook permit the College to punish a tenured professor for misconduct through the mechanism of the annual renewal of employment. Plainly, the terms of the plaintiff s 1994-1995 contract were punitive and would not have been imposed without a finding of misconduct.
The Handbook’s tenure provision (promising renewal until age 70, absent cause) and its annual renewal provision (mandating termination, unless the renewal offer is accepted) are not irreconcilable. Where punitive factors predominate, as here, the Handbook provisions dealing with disciplinary procedures must prevail. The renewal provision, with its potential for termination without cause, must be reserved for cases in which the renewal bargain founders on economic or other grounds, unrelated to misconduct. This interpretation avoids the supersession of the tenure and disciplinary provisions by the renewal provision, and preserves a meaningful role for all three (Two Guys from Harrison-N. Y. v S.F.R. Realty Assocs., 63 NY2d 396, 404; see also, Restatement [Second] of Contracts § 202 [5] [which states: "(W)herever reasonable, the manifestations of intention of the parties * * * are interpreted *464 as consistent with each other and with any relevant * * * usage of trade”]).
The rules found in the Handbook are ill-suited to deal with cases of intentional wrongdoing. Only section 9.6 is directed to cases of malfeasance which section 9.6.1 (a) defines as: "a purposeful misconduct in or related to a faculty member’s responsibilities to the College”. These provisions were not invoked. Instead, the Provost imposed a limited punishment, in the form of a punitive renewal contract which is not clearly contemplated by the Handbook, rather than the draconian sanction (termination) which is expressly authorized under section 9.6.2 (b). While the limited punishment chosen by the College may have served the purposes of justice, assuming the plaintiffs guilt, the court is not in a position to rework the Handbook rules and regulations to suit the peculiarities of this case.
We conclude that facts have been shown which would permit a jury to find that the defendant imposed punishment, in the form of demotion, for the misconduct of Professor Klinge without following the rules it bound itself to observe in such cases. Where a college has adopted a rule, the law requires substantial compliance (Tedeschi v Wagner Coll., 49 NY2d 652, 660). The plaintiff, therefore, may be entitled to compensatory damages for the difference between his former salary and his 1994-1995 salary. Accordingly, the motion for summary judgment, dismissing the contract cause of action, must be denied.
We turn to the cause of action for prima facie tort which requires the presence of malice, the absence of any lawful excuse or justification, and the lack of any traditional remedy at law or equity (Curiano v Suozzi, 63 NY2d 113; Murphy v American Home Prods. Corp., 58 NY2d 293, 303, supra; Beardsley v Kilmer, 236 NY 80, 90; Roberts v Pollack, 92 AD2d 440, 447; Springer v Viking Press, 90 AD2d 315, 318). The plaintiffs claim against the College and its executive officers fails on all three counts.
The College has an important and, indeed, a vital interest in preserving its academic reputation and the integrity of its faculty. The Dean, Provost and President were duty bound to investigate the charge of plagiarism and to reach a reasoned conclusion, based on the evidence. They did so and defendants, thereby, have established a legitimate educational reason, independent of malice, to justify their actions. Hence, the publication which occurred between and among the two professors, the Dean, Provost and President, as well as their aides, enjoyed *465 a conditional privilege (Prosser and Keaton, Torts § 115 [5th ed]). Moreover, other traditional remedies are available and, indeed, have been invoked by the plaintiff in his causes of action for breach of contract and intentional infliction of emotional distress. Accordingly, plaintiff’s prima facie tort claim must be dismissed (Curiano v Suozzi, 63 NY2d, supra, at 117; Murphy v American Home Prods. Corp., supra, at 303-304).
The basis for the claim of intentional infliction of emotional distress is summarized at paragraph 33 of the Klinge affidavit of August 18, 1995 which concedes that "Ithaca College may initially have had a legitimate business interest in investigating the allegations” but argues that the secrecy of the proceedings, and the failure to inform the plaintiff of the charges from October 1993 until May 1994, represent extreme and outrageous conduct which meets and exceeds the threshold requirements for the maintenance of the cause of action.
The tort is described by Restatement (Second) of Torts § 46 (1) as requiring extreme and outrageous conduct which intentionally or recklessly causes severe emotional distress. This definition was adopted for New York in Fischer v Maloney (43 NY2d 553). Comment d makes clear that the conduct must be so outrageous in nature and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as intolerable in civilized society. Assuming, arguendo, that the officers of the College dawdled with the inquiry, failed to alert the plaintiff at the outset and, perhaps, applied old fashioned standards to the question of plagiarism, we nevertheless conclude that such procedural imperfections do not, singly or in combination, amount to outrageous and intolerable departures from civilized conduct.
The plaintiff also argues that defendant "undertook a deliberate and malicious campaign * * * conceived and executed in a manner designed to inflict maximum professional, economic and social humiliation upon him” (plaintiff’s mem of law, at 9). These allegations, if true, would sustain the cause of action (Nader v General Motors Corp., 25 NY2d 560, 569; Kasachkoff v City of New York, 107 AD2d 130, 137; Roberts v Pollack, supra, at 447-448). In support of that charge, the Klinge affidavit states that, from the fall of 1994, he heard reports that the charges of plagiarism, and his demotion, were being openly discussed on campus. On November 1, 1994, the College paper printed full details, including extended comparisons between the text of his book and other books and articles which had been published earlier. Other newspapers, in Ithaca and Syracuse, published similar reports.
*466 Plaintiffs affidavit contains no evidentiary facts which would support a finding that the College, or its officers, were responsible for these disclosures to the general campus community or the newspapers. Indeed, the only direct evidence of such a connection submitted by plaintiff is an October 5, 1994 memo from the Dean which admonishes the recipients (presumably, the two initial faculty accusers) to "maintain strong and complete confidentiality” regarding the matter. It does not follow, from the fact that officers of the College were privy to the charges, that any disclosure must be attributed to them. It is even more speculative to contend that the officers of the College sponsored or condoned a deliberate campaign of vilification to injure plaintiff. Mere surmise, conjecture or unsubstantiated assertions will not suffice to defeat a motion for summary judgment (Zuckerman v City of New York, 49 NY2d 557, 562).
Lastly, we consider the plaintiffs motion to amend the complaint to substitute Professors Rowley and Zimmerman in lieu of John Doe and Jane Roe. As noted earlier, the prima facie tort action does not lie where other traditional remedies exist (Curiano v Suozzi, 63 NY2d, supra, at 117; Cartwright v Golub Corp., 51 AD2d 407) and, accordingly, the motion is denied in that respect.
The emotional injury claim stands differently. College rules enjoin confidentiality regarding communications affecting renewal, promotion and disciplinary matters (Handbook, §§ 7.1.3.2.1, 10.3.3). This requirement, as noted earlier, was brought to the attention of the professors who initiated the inquiry. Clearly, the professors enjoyed a qualified privilege to report matters to College authorities which, however false and defamatory, were relevant to the common interest of the faculty and the institution (Stukuls v State of New York, 42 NY2d 272).
The plaintiff’s verified bill of particulars identifies a number of hearsay declarants as the sources of plaintiffs claim that Professor Zimmerman was spreading news of the plagiarism charges and had disclosed full detáils to the campus newspaper. Hearsay, where its source is named, may be considered in opposition to a motion for summary judgment (Phillips v Kantor & Co., 31 NY2d 307, 312). The rule is particularly apt where, as here, discovery has not been completed.
It is well established, in the law of defamation, that the qualified privilege to publish false and defamatory matter may be lost if misused (Stukuls v State of New York, supra). In Howell *467 v New York Post Co. (81 NY2d 115), the Court of Appeals drew upon that source and applied the defamation rule, regarding loss of the privilege, to the independent tort of intentional infliction of emotional distress. This result is in accord with the revision of the Restatement which incorporated the qualified privilege concept in the definition of the emotional injury cause of action (Restatement of Torts § 46 [1948 Supp]).
Section 604 of the Restatement (Second) of Torts recognizes, in dealing with false and defamatory statements, that "excessive publication” may defeat the privilege. Based upon the holding in Howell (supra), and the 1948 revision of section 46 of the Restatement, section 604 seems fully applicable here. Assuming that Professors Roe and Doe, as they are now styled, needlessly and indiscriminately disclosed the false and defamatory plagiarism charges to members of the campus community, in violation of College rules, and gave a copy of their accusatory memorandum to the campus newspaper for publication, the scope of the qualified privilege may have been exceeded.
Section 46 of the Restatement does not attempt to quantify the "extreme and outrageous” element so central to the cause of action. However, comment d suggests that the moral sensibilities of "an average member of the community” must be aroused. Clearly, an allegation of plagiarism is unlikely to inflame a community of illiterates. Among a community of scholars, however, the same charge is calculated to destroy a career. Accordingly, we hold that an unprivileged publication of a charge of plagiarism in an academic community, if false or made with reckless indifference to its truth, meets the threshold test of section 46 and, a jury could find, amounts to "extreme and outrageous” conduct.
The cross motion to add Professors Rowley and Zimmerman as party defendants, in the cause of action for the intentional infliction of emotional distress, is granted without prejudice to renewal of the motion to dismiss, upon the completion of discovery. Among other matters, discovery may clarify the scope of the duty owed by the professors to the plaintiff (cf., Chapadeau v Utica Observer-Dispatch, 38 NY2d 196). The plaintiff’s cross motion for sanctions is denied.
Defendant to submit a single order, on notice.