OPINION OF THE COURT
Walter J. Relihan, Jr., J.
The defendant College moves for summary judgment dismissing the complaint in its entirety. On an earlier motion, we dismissed the complaint against the College officers, as individuals. We also held that the College is not a “State actor” (Klinge v Ithaca Coll., 167 Misc 2d 458, 461, mod on other grounds 235 AD2d 724; see also, Moghimzadeh v College of St. Rose, 236 AD2d 681). In consequence, plaintiff now withdraws the ninth cause of action asserting constitutional and related statutory claims.
I. FACTS
The College administration promulgated a Faculty Handbook in 1975 which contained a compilation of institutional rules and procedures governing the appointment, promotion, discipline and termination of faculty members (hereafter, Handbook I). In 1977 the Board of Trustees approved institutional bylaws which, at article XI, state that: “The Faculty shall be governed by the regulations of the College specified in * * * the Faculty Handbook as approved by the Board of Trustees.” In 1992, a general revision of the Handbook was approved by the Board of Trustees, effective on August 16, 1993 (Handbook II).
The Board of Trustees, in 1984, adopted an Equal Opportunity/Affirmative Action Policy Statement (E.O./A.A.). *719 Later, a Sexual Harassment Policy (Policy) was promulgated by the President, without specific endorsement by the Trustees, which provided that harassment complaints would be handled under another policy document, entitled Guidelines for Resolving Discrimination Complaints (Guidelines). The Guidelines establish a Discrimination Complaint Review Committee to hear appeals and make recommendations to the President, whose decision is described as final.
The plaintiff became fully aware of the College rules on sexual harassment when, in 1986, he was warned by President Whalen that the sexual innuendos and allusions used by plaintiff in the classroom were considered a violation of the Policy, would not be tolerated and, if continued, could lead to termination. In 1992, the written complaints of three female students charging similar conduct precipitated another investigation pursuant to the Policy and the Guidelines. These complaints, and the subsequent termination of the plaintiff’s employment, are the subjects of this litigation.
The affirmative action officer of the College sustained the 1992 charges and Provost Longin, after review, accepted her findings. A plan of remediation was devised by the Provost in November 1992, which included visitations to the plaintiff’s classroom by a Dean and evaluations of the plaintiff’s conduct by his students at the end of the ensuing spring semester. Plaintiff appealed the Provost’s determination to the Discrimination Complaint Review Committee which, in February 1993, affirmed both the findings and the proposed remediation plan.
Thereupon, the plan was put into action. At the end of the semester the Dean, who monitored the plaintiff’s classes on a dozen occasions, reported to the Provost that plaintiff had not abided by the corrective plan and that his classroom language and conduct continued to violate the Sexual Harassment Policy. This conclusion, the Dean reported, was confirmed by the student evaluations.
Plaintiff was apprised of these findings and invited to respond. Although two meetings were held, plaintiff declined to discuss the merits of the findings with the Dean and the Provost. After considering the evidence, and in the absence of any substantive rebuttal, the Provost recommended dismissal. President Whalen accepted this recommendation and, on August 17, 1993, dismissed plaintiff.
II. THE ISSUES
The complaint, while diffuse, may be summarized as follows: The President acted, ultra vires, in the promulgation of a Col *720 lege Sexual Harassment Policy; the disciplinary rules contained in Handbook I were ineffective, never having been approved by the Trustees and, in any event, the College failed to follow its own rules and procedures under Handbooks I and II and, thus, breached its employment contract with plaintiff; the College violated a special duty, arising out of the relationship of faculty members to the institution, in handling the harassment complaints; the College interfered with plaintiff’s prospective economic advantage and violated Federal regulations governing the College as a recipient of Federal funds.
III. THE CONTRACT CLAIM
The plaintiff relies upon a breach of contract theory but argues, nevertheless, that the disciplinary rules contained in the Handbooks were never validly adopted by the institution. If that contention is accepted, of course, the breach of contract theory must fail. We assume, however, that plaintiff’s claim that defendant failed to follow its own Handbook rules can only be understood to state a breach of contract claim. For reasons which have been fully stated elsewhere (Klinge v Ithaca Coll., supra, 167 Misc 2d, at 461-462) we hold that the Handbook rules, if duly authorized, are contractual in nature and, so far as applicable, bind both the College and the plaintiff.
Holm contends that Handbook I was never adopted by the Board of Trustees and that Handbook II, which was, became effective only after the events which impelled the College to terminate him. Handbook I, concededly, was first published in 1975 without prior Trustee approval. However, the institutional bylaws adopted by the Board in 1977 refer to the Handbook as having been “approved” by the Trustees. Whatever de facto effect Handbook I may have enjoyed between 1975 and 1977, the Trustees’ adoption of the bylaws on May 13, 1977, with an explicit and approving reference to Handbook I, gave that document undoubted validity thereafter. It is not disputed that Handbook II had been formally approved by the Trustees and was in effect when the President’s letter of dismissal was dispatched.
Handbook I had taken effect when the harassment charges were brought against plaintiff, in May 1992, and remained in effect throughout the entire period during which his conduct was being monitored, as part of the remediation program, under the authority of the Sexual Harassment Policy and the Guidelines for Resolving Discrimination Complaints. Presum-
*721 ably, the termination provisions of Handbook I, at article IV, subsection B (2) (a) (1), could have been followed during that period. Those rules provide that: “When the administration believes that a faculty member with tenure is beginning to behave so as to provide adequate cause for his dismissal, the President of the College will write him a letter stating what has been his malfeasance”. This process, once initiated, would permit the accused to deny the charge and request the convocation of a special peer review committee (subsection B [2] [a] [2]).
Arguably, plaintiff’s rights under Handbook I, article IV, subsection B, may have been greater than those afforded by the discrimination complaints procedure. However, plaintiff’s election to proceed as he did cannot be attributed to the College, which, as noted below, was authorized to investigate and required to remedy harassment complaints under the concurrently valid Sexual Harassment Policy.
After the conclusion of the remediation period, Handbook II became effective. Under section 10.3, plaintiff could have appealed the President’s termination decision to the Faculty Grievance Committee. Section 10.3.1, subsections (a) and (b), permit an aggrieved member of the faculty to appeal administrative actions, including terminations, which concern an alleged “Denial of academic freedom”, defined as “dismissal without adequate justification”. The plaintiff did not file a grievance within 30 days after the dismissal and, thus, waived the opportunity to present his case to his faculty peers.
The plaintiff, having waived the procedures available under Handbooks I and II, has no basis to contend that the College breached its contractual duty by refusing to grant him the Handbook I peer review or the Handbook II grievance. Moreover, plaintiff has asserted no claim that he was misled, deceived or frustrated by the College in respect to his rights under the Handbooks.
Quite apart from his contractual rights under Handbook I or II, plaintiff could have brought a timely CPLR article 78 proceeding to challenge the fairness of the procedures or the substantive results. (Gertler v Goodgold, 107 AD2d 481, affd 66 NY2d 946; Klinge v Ithaca Coll., 244 AD2d 611.) No such special proceeding was commenced.
IV. SEXUAL HARASSMENT POLICY CLAIM
We turn to the argument that the Sexual Harassment Policy, promulgated by the President, was not binding upon the fac *722 ulty. In Maas v Cornell Univ. (245 AD2d 728), the Appellate Division, Third Department, recently held that sexual harassment procedures adopted by a subordinate unit of the University (i.e., the College of Arts and Sciences) were valid, though not explicitly adopted by the Trustees, where the record as a whole indicated that the subordinate body acted “within the confines of its authority” (Maas v Cornell Univ., supra, at 730). Given the untidy governance arrangements often found in academia, the Court may have reasoned that parallel and even overlapping policies may enjoy concurrent validity where the Trustees, by one means or another, have signaled their acquiescence.
Here, the Sexual Harassment Policy was adopted, not by a subordinate academic unit which lacked any explicit authority to adopt such rules, but by the President who, under the bylaws, is the chief executive officer of the institution and is directly responsible to the Board of Trustees. Moreover, the President’s authority to issue the Sexual Harassment Policy may be traced to the Equal Opportunity/Affirmative Action Policy Statement adopted by .the Trustees on October 1, 1982. The E.O./A.A. Policy stated that discrimination on the grounds of sex “will not exist in any area, activity, or operation of the College” and that the College intended “to ensure that educational opportunities and services offered by the college * * * are provided equitably to all students, including those who are women”.
Thereafter, and without further resort to the Trustees, the President promulgated a Sexual Harassment Policy which, echoing the E.O./A.A. Policy, stated that the College “seeks to ensure that the College community is free from all forms of sexual harassment” including attempts “to subject a person to unwanted sexual attention, verbal or physical”. The Policy issued by the President defines sexual harassment to include the creation of “an intimidating, hostile, or offensive working or educational environment” on the basis of sex or sexual identity.
In our view, the Sexual Harassment Policy and the Guidelines for Resolving Discrimination Complaints, though not directly anointed by the governing board, fall within the delegated powers of the President and simply implement the Trustees’ E.O./A.A. Policy Statement. Indeed, it is precisely the duty of the President to translate broad policies adopted by the Trustees into effective administrative actions (bylaws art V). We also note, in passing, that colleges and universities receiving Federal funds are obliged to enforce Federal law and *723 regulations which prohibit sexual harassment in the classroom and elsewhere in the educational environment (20 USC § 1681, added by Pub L 92-318, tit IX, § 901; 34 CFR 106.8 [b]).
Plaintiff sought review of the Provost’s findings and remediation plan by the Discrimination Complaint Review Committee which, as noted earlier, sustained the findings and the plan. This choice was not the result of any compulsion by the College. The Guidelines for Resolving Discrimination Complaints provide that its formal steps may be followed “Where there are no other appropriate procedures”. Such “other” procedures were available to members of the faculty under Handbook I and could have been invoked by plaintiff, at his election.
V. TORT CLAIMS
Charles v Onondaga Community Coll. (69 AD2d 144, appeal dismissed 48 NY2d 650), a case on remarkably similar facts, held that a claim for wrongful dismissal could not be founded upon a special duty, arising out of the relationship between a tenured faculty member and a college employer, which is independent of the rights and duties to be derived from the bylaws, policies, regulations and procedures which define the governance structure of the institution.
Since plaintiff has failed to demonstrate that defendant deprived him of any rights he may have enjoyed under the provisions found in the Handbooks or other employment rules, or that defendant acted in a manner which precluded his resort to Handbook procedures or other available rights, there is no foundation for a claim that defendant breached any implied special duty of good faith and fair dealing (Rowe v Great Atl. & Pac. Tea Co., 46 NY2d 62; Jaffe v Paramount Communications, 222 AD2d 17, 22-23).
“It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated * * * This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract” (Clark-Fitzpatrick, Inc. v Long Is. R. R. Co., 70 NY2d 382, 389; see also, Fort Ann Cent. School Dist. v Hogan, 206 AD2d 723, 725).
The complaint, while alleging the same facts under a variety of labels, does not establish a negligence theory which is sufficiently distinct from the breach of contract claim to stand on its own. There is no cause of action for the negligent performance of a contract (Johnson City Cent. School Dist. v Fidelity & Deposit Co., 226 AD2d 990, 993).
*724 VI. REMAINING CLAIMS
A. Interference with Contractual Relations
The plaintiff has produced no evidence that the motives of the College were wholly or even partly unrelated to a legitimate intent to enforce its policy on sexual harassment. Moreover, there is no showing that “wrongful means” were employed to advance that lawful purpose (NBT Bancorp v Fleet / Norstar Fin. Group, 87 NY2d 614; 72 NY Jur 2d, Interference, § 44). Mere conclusory allegations regarding a prospective loss of benefits will not suffice (Gertler v Goodgold, 107 AD2d 481, 489-490, supra) and the mere heaping up of epithets (viz., maliciously, knowingly, wantonly, etc.) does not “convert the complaint from one in contract to one in tort” (Charles v Onondaga Community Coll., supra, 69 AD2d, at 148).
B. Defamation
The complaint does not appear to assert a defamation cause of action but describes injuries which are customarily attributed to such a wrong. Assuming, arguendo, that such a claim can or should be extruded from the cumulative allegations of the complaint, we conclude that the evidence submitted does not create a question of fact as to whether defendant published any information about plaintiff’s conduct, beyond the circle of those who needed to know, or that any such publication was malicious and, therefore, beyond the scope of the qualified privilege which would otherwise surround such publication (Stukuls v State of New York, 42 NY2d 272).
C. Federal Regulations
The Federal regulations cited by plaintiff simply require the institution to bar sexual harassment and to provide a forum and a procedure for the disposition of such complaints. It cannot be doubted that the College fully complied with thése requirements.
VII. CONCLUSION
The College, by reason of Federal law and pursuant to its own internal policies and procedures, is obliged to hear and determine complaints of sexual harassment by students against faculty members. The President acted within the scope of his delegated powers in promulgating the Sexual Harassment Policy. The College has the right to terminate tenured professors for cause. There is no evidence from which a trier of *725 the fact could infer that the College, in handling the complaints against plaintiff, violated its own rules. He chose not to commence a special proceeding, under CPLR article 78, to test the propriety of the College’s disciplinary actions. The plaintiff had a variety of contractual remedies under the disciplinary rules applicable to faculty, and elected not to invoke those rights. The College did not violate any putative special or fiduciary duty owed to plaintiff. No issue of fact is present which, if resolved in plaintiff’s favor, would entitle him to the relief he seeks under any recognized theory of contract or tort liability. The complaint should be dismissed.
Submit order on notice granting defendant’s motion for summary judgment.