920 So.2d 81 (2006)
UNIVERSITY OF MIAMI, Appellant,
v.
Lee FRANK, M.D., Ph.D., Appellee.
No. 3D04-477.
District Court of Appeal of Florida, Third District.
January 18, 2006.
Isicoff, Ragatz & Koenigsberg, and Eric D. Isicoff and Teresa Ragatz, Miami, for appellant.
Jay M. Levy, Miami; Marlowe J. Blake (Hallandale), for appellee.
Before RAMIREZ, WELLS, and SHEPHERD, JJ.
SHEPHERD, J.
The University of Miami appeals an adverse final summary judgment finding that the University breached its employment contract with Dr. Lee Frank. Based upon a de novo review, see Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126 (Fla.2000)(appellate court reviews grant of summary judgment de *82 novo), we conclude the agreement between the parties is unambiguous and affords no relief to Frank. Accordingly, we reverse the judgment in favor of Frank and direct that judgment be granted to the University on its cross-motion.

FACTS
Dr. Lee Frank is a tenured Professor of Medicine in the University of Miami School of Medicine. He joined the UM medical school staff in 1979 as an assistant professor and was awarded tenure in 1985.
In 1975, many years before Frank joined the faculty, the University of Miami Board of Trustees, responding to medical school faculty protests over the uncertainty of the University's financial commitment to its regular full-time faculty in the tenure series, adopted a proposal presented to the Board by the University Faculty Senate[1] to resolve the issue. The central palliative provision agreed upon by the Board and Faculty Senate appears under the heading, "Appointment and Tenure" in the 1985 edition of the Faculty Manual, which the parties agree constitutes the governing document for the resolution of this dispute. It reads as follows:
II. KINDS OF APPOINTMENTS[2]
* * *
B. Regular Appointments with limited financial support
1. This category is limited to those regular tenured appointments in the School of Medicine in which faculty members have their appointments continued from year to year with the University committed to providing them that salary for which the University accepts responsibility. The dollar amount of the tenured salary for each academic rank shall be at least equal to that specified by the University as the minimum for that rank. That amount of financial support for which the University accepts responsibility may not be decreased except in times of financial exigency.[]
2. The President of the University, or his designee, shall determine annually which sources of funds (and in what amounts) the School of Medicine may consider sufficiently secure to use in fulfilling the obligations associated with tenure with limited financial support. ... Research grants and contracts are not considered sufficiently secure to warrant their use in fulfilling the obligations associated with tenure with limited financial support.
(Footnote and emphasis added.)
Before this proposal was adopted and placed in the Faculty Manual, it had been impossible for the University to specify to a tenured member of the School of Medicine the extent of the University's financial commitment. Yet, it was to take another full year until the implementation details could be composed by the School of Medicine *83 Faculty Council and approved by the President of the University. By a May 19, 1976 memorandum to all medical school faculty, Dr. W.J. Whelan, an associate dean in the medical school who had been intimately involved in the negotiations, informed his faculty of the completion of those details:
On May 21, 1975, the Board of Trustees enacted the system of tenure with limited financial support for tenured faculty of the School of Medicine. The system has three main features:
1. The tenured faculty member would be guaranteed a `tenured salary', defined as that salary which the University would guarantee until resignation, termination for cause, death or retirement.

2. The President of the University, or his designee, is required annually to determine which sources of funds (and in what amounts), the School of Medicine shall consider sufficiently secure to support the granting of financial tenure.
3. The dollar amount of the tenured salary for each academic rank shall be at least equal to that specified by the University as the minimum for the rank. That amount of financial support for which the University accepts responsibility may not be decreased except in times of financial exigency, as applicable to all tenured and tenure-earning appointments.

(Emphasis added.)
The memorandum also stated that the amount of each faculty member's "tenured salary" henceforth would be determined by a mathematical formula:
B. In regard to item 3, the dollar amount of the tenured salary shall be related to a person's current highest salary as follows:
75% of the first $40,000 of salary, and
50% of salary in excess of $40,000.
Eight days later, Whelan sent a second memorandum to his colleagues, explaining how the new compensation system would be shown on each faculty member's annual contract:
With the approval of the method of implementation of the system of tenure with limited financial support, as explained in my memorandum of 19 May 1976, we are now showing the tenured salary on the face of each tenured faculty member's contract.

This sum is calculated in terms of the current highest salary and is arrived at by taking 75% of the first $40,000 of salary, plus 50% of any salary in excess of $40,000.
* * *

The sum of money shown as the tenured salary is the minimum total salary, defined as above, and paid through the University payroll system and/or by the external agency, that the faculty member will receive during 1976-77, and may not be decreased except in times of financial exigency, as applicable to all tenured appointments.[3]
*84 (Footnote and emphasis added.) A review of the record in this case demonstrates there have been no material changes to this compensation system for the tenured faculty associated with the University of Miami School of Medicine since that time.
Ever since he was awarded tenure in 1985, Frank's employment as a tenured professor in the medical school was confirmed annually with a document entitled "Regular Appointment  Tenured", which set forth his salary for the upcoming year.[4] For the fiscal year beginning June 1, 1992, the confirmation document read as follows:
UNIVERSITY OF MIAMI
REGULAR APPOINTMENT  TENURED
To: Frank MD PHD, Lee Date: July 30, 1992
[]
I am pleased to inform you that your BASE salary[5] for the period June 01, 1992 THRU May 31, 1993 will be $84,800 to be paid from the following accounts:
VARIOUS
YOUR TENURED SALARY FOR THIS PERIOD IS: 52,400
This letter acknowledges your tenured status on the faculty and that your rank will be as
PROFESSOR
in the Department of MEDICINE
Your rights, duties, and benefits as a faculty member at the University of Miami are set forth in the Faculty Manual, and it is your responsibility to familiarize yourself with the regulations prescribed therein and in subsequent memoranda of revision.
Please sign and return to your department chairman all copies of this appointment (except the last copy, which is for your files) and the enclosed personal data sheet. The appointment is invalid if any alterations are made hereon without the approval of the Provost.

*85 If you have any questions concerning this appointment, please contact your department chairman or dean.
For faculty of the School of Medicine, if a Medical Supplement is attached, it is part of this appointment.
 /s/ Lee Frank /s/ Luis Glaser
 [Provost]
(Footnote added.) The "tenured salary" entry was calculated pursuant to the methodology established by agreement between the University and faculty in 1975.
A year later, on August 24, 1993, Frank received his next annual confirmation of employment as a tenured professor in the School of Medicine. This confirmation was identical in all respects to the one he received the prior fiscal year, except that the base salary portion of the confirmation read:
* * *
I am pleased to inform you that your BASE salary for the period June 01, 1993 THRU May 31, 1994 will be $52,400 to be paid from the following accounts:
VARIOUS
YOUR TENURED SALARY FOR THIS PERIOD IS: 52,400.
* * *
(Emphasis added.)
Frank should not have been caught by surprise. Frank is a research professor who specializes in pediatric pulmonary research. For more than four years, his research laboratory, which boasted one of the largest staffs in the School of Medicine, operated at a deficit of several hundred thousand dollars per year. Frank's efforts to secure extramural funding to cover the costs of his work, an obligation of all research scientists like Frank, had been unavailing. His last remaining significant source of funding had advised him that it wished to have its funds re-directed. The School of Medicine was no longer financially able to support his quest. Frank also had declined suggestions from the medical school that he either re-direct his research or join another research team. At the end of 1994, the School of Medicine withdrew its support for his investigative effort, and Frank's laboratory necessarily closed. Since that time, the University has continued to carry Frank as a tenured professor on its staff and pay him his "tenured salary."

DISCUSSION
The trial court found in favor of Frank on the ground that the operative terms of the Faculty Manual were ambiguous and therefore must be construed against the University, whom the court concluded was the drafter. Paradoxically, both Frank and the University begin their pleas before this court with the argument that the Faculty Manual is unambiguous and compels the rendering of judgment in their favor. See Miller v. Kase, 789 So.2d 1095, 1098 (similarly noting "the paradox of each side claiming that the contract is clear and unambiguous" but where each side "ascribes a different meaning to the `unambiguous' language of the contract"). Frank argues that because the Faculty Manual expressly allows for the grant of salary increases but not decreases,[6] the University is prohibited ipso facto from reducing the salary of a tenured medical *86 school faculty member except in cases of "financial exigency." For legal support, he urges reliance upon the interpretative principle, inclusio unius, exclusio alterius, see Dobbs v. Sea Isle Hotel, 56 So.2d 341, 342 (Fla.1952)(the express mention of one thing is the exclusion of the other). However, Frank has not favored us with any authority supporting the application of this doctrine in the context of contract interpretation, as distinguished from statutory and constitutional interpretation, and our independent research likewise has revealed none. Cf. id. ("We have oft-times held that the rule ... is applicable in connection with statutory construction.")(emphasis added); see also Bush v. Holmes, Nos. SC04-2323, SC04-2324, SC04-2325, 919 So.2d 392, 2006 WL 20584 (Fla. Jan. 5, 2006)(applying inclusio unius principle of construction to constitutional interpretation). We, of course, have a question of contract interpretation presented to us by this case. Perhaps more importantly, we believe that in making this argument, Frank insufficiently credits and misinterprets the very language of the Faculty Manual that is dispositive to this case.
Whether a contract term is ambiguous is a question of law for the court. Escobar v. United Auto. Ins. Co., 898 So.2d 952, 954-55 (Fla. 3d DCA 2005). However, as we previously have indicated, we believe there is a provision of the Faculty Manual in this case that specifically governs the relationship between the parties. Stated again, that provision reads:
B. Regular Appointments with limited financial support
1. This category is limited to those regular tenured appointments in the School of Medicine in which faculty members have their appointments continued from year to year with the University committed to providing them that salary for which the University accepts responsibility. The dollar amount of the tenured salary for each academic rank shall be at least equal to that specified by the University as the minimum for that rank. That amount of financial support for which the University accepts responsibility may not be decreased except in times of financial exigency.[]
2. The President of the University, or his designee, shall determine annually which sources of funds (and in what amounts) the School of Medicine may consider sufficiently secure to use in fulfilling the obligations associated with tenure with limited financial support. ... Research grants and contracts are not considered sufficiently secure to warrant their use in fulfilling the obligations associated with tenure with limited financial support.
(Emphasis added.)
The parties agree that the Faculty Manual is the contractually governing document in this case. See Walton v. Health Care Dist. of Palm Beach County, 862 So.2d 852 (Fla. 4th DCA 2003)(acknowledging that an employee handbook or manual can serve as an employment contract); University of Fla. v. Collins, 678 So.2d 503 (Fla. 1st DCA 1996)(equating employee handbook with employment contract to determine compensation for sick leave). For nearly thirty years, tenured members of the medical faculty have been annually offered the continuation of their appointment in a document that included a "base salary" and a "tenured salary." Given the security afforded to tenured employment in the School of Medicine by the accretion of tenure, these two figures are and remain the significant datum in the *87 annual re-appointment documentation. For nearly a decade before this dispute arose, Frank allowed himself to be governed by this arrangement. He does not challenge the calculation of the "tenured salary" figure appearing on his 1993 continuation. We find the above provision of the Manual unambiguously establishes that Frank's guaranteed annual salary is his "tenured salary" as it appears in his 1993 continuation and no more.
In so doing, we necessarily reject Frank's argument that he forever is guaranteed receipt of his highest ever "base salary." To adopt Frank's position would be to render the term "tenured salary," as it appears in the Faculty Manual and each of Frank's annual appointment documents, utterly superfluous. The law of this state does not countenance such an interpretation. Paddock v. Bay Concrete Indus., Inc., 154 So.2d 313, 315 (Fla. 2d DCA 1963)("All the various provisions of a contract must be so construed, if it can reasonably be done, as to give effect to each."). Moreover, the adoption of Frank's construction of the contract would place us in the legally awkward position of adopting Frank's more general observations about the structure and content of the Faculty Manual as a whole over a more definite provision expressly designed to accommodate the special needs of the regular faculty of the School of Medicine. See Bystra v. Federal Land Bank of Columbia, 82 Fla. 472, 90 So. 478 (1921)(in the interpretation of contracts, the specific controls the general).
Although not necessary to our decision, we note we would reach the same result even if the Faculty Manual were found to be ambiguous. The parties hotly dispute whether the provisions agreed upon in 1975 to specifically treat the needs of the medical school were drafted by the Faculty Senate and should therefore be derivatively construed against Frank, or whether they were drafted by the University and therefore properly construed against it. We are inclined to conclude the disputed provisions were drafted by the Faculty Senate. We recognize the compensation scheme originally was conceived by a four-member, ad hoc committee equally composed of two medical school and two university administrative officials. However, we also note the faculty protest was not quelled until after the second administration attempt to calm its unruly members, and was finally overwhelmingly approved by a vote of the medical school faculty, the Executive Faculty of the School of Medicine, the University administration, and then formally adopted and proposed by the University Faculty Senate to the Board of Trustees of the University for inclusion in the Faculty Manual.
As previously stated, the parties agree the Faculty Manual constitutes the agreement by which this case is to be decided. The contracting parties to the agreement are the University Faculty Senate and the Board of Trustees of the University. We find the preceding efforts of the ad hoc committee, faculty members, and university personnel to be in the nature of pre-proposal groundwork for the Faculty Senate's legislative action. But, unlike Frank, who would have us leap from purported ambiguity in drafting by the University to an adverse result for the University, we believe the real significance of a finding of ambiguity is simply to allow a court to consider parol evidence. Danforth Orthopedic Brace & Limb, Inc. v. Florida Health Care Plan, Inc., 750 So.2d 774, 776 (Fla. 5th DCA 2000)(quoting Lemon v. Aspen Emerald Lakes Assocs., Ltd., 446 So.2d 177 (Fla. 5th DCA 1984))("It is a well-established legal principle that if a written contract is ambiguous so that the intent of the parties cannot be understood from an inspection of the instrument, extrinsic *88 or parol evidence ... may be received in order to properly interpret the instrument."). In this case, the parol evidence in the record makes it crystal clear that the University's financial commitment to the tenured medical faculty is limited to his or her tenured salary, computed pursuant to a formula based on current overall highest salary, which sum once established can only be reduced "in times of financial exigency." Thus, even if we were to assume for a moment the operative provisions of the Faculty Manual are ambiguous, we nevertheless would conclude Frank is not entitled to relief as a matter of law. Land O'Sun Realty Ltd. v. REWJB Gas Invs., 685 So.2d 870, 874 n. 3 (Fla. 3d DCA 1996)("when any ambiguity in an agreement may be resolved by applying the rules of construction to situations in which the parol evidence of the parties' intention is undisputed", contract interpretation is a matter of law); see also Team Land Dev., Inc. v. Anzac Contractors, Inc., 811 So.2d 698, 700 (Fla. 3d DCA 2002)("[I]f the facts of the case are not in dispute, the court will also be able to resolve the ambiguity as a matter of law.").
It is well established that in the event an "ambiguity exists in a contract construction, the court should arrive at an interpretation `consistent with reason, probability, and the practical aspect of the transaction between the parties.'" Paneson v. Paneson, 723 So.2d 385, 386 (Fla. 2d DCA 1999)(quoting Biltmore Sys., Inc. v. Mai Kai, Inc., 413 So.2d 458, 459 (Fla. 4th DCA 1982)). Our analysis here comports with this admonition. The contrary position urged upon us by Frank is illogical. If a Medical School faculty member has an exceptionally productive year  let us say, is awarded the Nobel Prize in Medicine  and is rewarded with a merit increase, adherence to Frank's reasoning would bar the University forever from reducing that individual's highest ever overall compensation, even if subsequently the faculty member's productivity became poor. Such an interpretation would work to the detriment of faculty as it would serve as a disincentive for the University ever to reward productivity. Such a rule likewise would work to the detriment of the University because, if it did reward productivity, it forever would be bound to pay a faculty member the highest overall annual compensation ever paid, regardless of whether that faculty member ceases to be productive. Moreover, such a rule could serve as a disincentive for faculty members to continue to be productive after they have been rewarded for a very productive year  they forever would be guaranteed that they would always make the salary earned in their best year, regardless of whether they simply stopped working. We would find remarkable the existence of such an inflexible system of compensation anywhere, even in the privileged world of tenured academia. See Klinge v. Ithaca College, 167 Misc.2d 458, 634 N.Y.S.2d 1000, 1003 (N.Y.Sup.Ct.1995)("Clearly, no college is required to perpetuate and even improve salaries or benefits each year, simply because the incumbent is tenured.").
For the foregoing reasons, we reverse the judgment below with directions that the trial court enter judgment in favor of the University.
Reversed and remanded with directions.
NOTES
[1] The system developed for that purpose, which necessarily varied in significant detail from that applicable to other UM faculty members, was proposed by a four-member, ad hoc committee equally composed of medical school and university administrative officials and finally, after two attempts, overwhelmingly approved by a vote of the medical school faculty and adopted by the University Faculty Senate.
[2] The Faculty Manual describes four kinds of faculty appointments: (a) Appointments to the Regular Faculty; (b) Regular Appointments with Limited Financial Support; (c) Appointments Not Involving Tenure; and (d) Term Appointments. All tenured faculty members within the School of Medicine are "regular appointments with limited financial support." It is undisputed that this is the type of appointment applicable to Frank.
[3] In his final report to the medical school faculty the next month, on June 22, 1976, Whelan summarized the end product of this multi-year effort as:

* * *
3. A system of tenure with limited faculty support, applicable exclusively to faculty in the tenure series (referred to in this memorandum as `regular full-time faculty'), which states that each tenured faculty member will be guaranteed a `tenured salary', that salary which the University will provide until resignation, termination for cause, death or retirement. The amount of this support may not be decreased except in times of financial exigency.
* * *
The intent of this system, as outlined above, is to stipulate to the tenured faculty member the dollar amount of the University's guaranteed commitment to him. The original legislation carried the provision that the amount of the salary would be at least equal to the minimum specified by the University for that rank. These minima are rather low and it was always the intent to fix a level of support which would represent a more realistic salary, short of guaranteeing total salary, and one that the University could back from sources of funds considered sufficiently secure to support financial tenure.
All three of these memoranda at all times have been accessible to the medical school faculty.
[4] Consistent with the practice throughout academia, tenure appointments at the University of Miami School of Medicine continue indefinitely. For tenured faculty at the University of Miami, the Faculty Manual stipulates that "Tenure of a faculty member shall continue until death, resignation, retirement because of age or disability, termination for cause or in extraordinary circumstances because of financial exigency or reorganization."
[5] As explained by Whelan in his May 27, 1976 memorandum, see supra pp. 83-84, the annual confirmation for tenured medical faculty includes both a "base salary" and "tenured salary" figure. The "base salary" represents the total sum that a tenured faculty is expected to receive through the University payroll system excluding certain types of non-recurring supplemental income, pension contributions, and other benefits. A "base salary" is reported to all tenured faculty in the University annually and constitutes their contract continuation without the necessity of appointment or re-appointment.
[6] Frank directs our attention to the section of the Manual entitled, "XII. FACULTY APPOINTMENTS, MERIT SALARY INCREASES, PROMOTIONS AND TENURE", which prescribes an elaborate annual evaluation procedure employed by the University to evaluate all faculty members for merit increases. Neither this section of the manual nor any other addresses decreases. Frank is not the first member of the medical school faculty to have his annual base salary decreased.