Fuchsberg, J.
This claim for libel and slander was brought against the State by Dr. Henry I. Stukuls, a former member of the faculty of the State University College at Cortland. The *274 allegedly defamatory matter was uttered and published by Dr. Whitney T. Corey, a vice-president for academic affairs at the college, who, in the absence of Dr. Richard Jones, the college’s president, would also act in the latter’s stead.[1]
The case comes to us on appeal from the disposition of two motions, that of Dr. Stukuls for pretrial discovery and the State’s cross motion under CPLR 3211 (subd [a], par 7) to dismiss the claim for failure to state a cause of action. The cross motion was granted by the Court of Claims because it was of the opinion that the doctrine of absolute privilege was applicable; it then dismissed the discovery motion as moot. The Appellate Division affirmed, but by a divided court, the dissent taking the view that only a qualified privilege was available in this case. For the reasons which follow, we hold that the doctrine of absolute privilege was not a bar to the claim.
The defamation is said to have taken place when, as both parties agree, Dr. Corey, at a meeting with the members of a five-man ad hoc faculty committee which had been chosen to pass on, Dr. Stukuls’ qualifications for tenure, read the contents of a letter which it is not denied accused Dr. Stukuls, a married man, of having attempted to seduce a young woman who was a student in one of his classes.[2] It is not disputed that the truth of the assertions, made by an unnamed author, had never been verified though the letter had arrived at the college months earlier. Dr. Stukuls has never actually seen the letter, heard it read or been afforded the opportunity to do so. However, the Court of Claims Judge, after making an in camera inspection of it upon the return of the motion for discovery, found "[t]here is no question that, if not true, statements contained in the letter were libelous.” Dr. Corey, in his affidavit, does not suggest that the claimant’s expressed understanding of the import of the letter is either inaccurate or exaggerated, nor does he add any qualifying matter to indicate that its description is taken out of context.
*275 In his verified claim and supporting affidavit, the claimant adds that Dr. Corey was opposed to the grant of tenure and, because of a malicious and willful design to have it denied, had, among other things, chosen to advantage himself of President Jones’ absence from the country to take the letter from the president’s private file so that he might use it as a means of affecting the committee’s judgment, read the letter to the committee though he knew its accusations had been the subject of a rumor that had been circulated and discredited many months earlier, and, as he has since admitted to Dr. Stukuls and to others, removed favorable student course evaluations and letters from Dr. Stukuls’ personnel file before submitting it to the committee. The claimant pleads that, as a consequence of the uttering and publishing of the defamatory matter, he was denied tenure and was greatly injured in his personal and professional reputation.
Against that background, and bearing in mind that on a motion under CPLR 3211 (subd [a], par 7) we are concerned with whether the pleading states a cause of action rather than the ultimate determination of the facts (see Rovello v Oroñno Realty Co., 40 NY2d 633), we turn to the central question on this appeal: Is defendant protected by an absolute privilege or a qualified one?
The difference between the two rests in the role of malice. A qualified privilege is one that is available only in the absence of malice, while an absolute privilege, a veritable immunity, is impervious to proof, and therefore to a charge, of malice (Andrews v Gardiner, 224 NY 440, 446).
Absolute privilege is an ancient doctrine. Long recognized by English law as a means to protect freedom of speech and deliberation in Parliament, it was later embodied in American Constitutions, including that of New York State (NY Const, art III, § 11), so that our legislators would enjoy an uninhibited range of freedom to propose, oppose, debate, adopt or reject ideas as precursors to legislative action (see Yankwich, Immunity of Congressional Speech—Its Origin, Meaning and Scope, 99 U of Pa L Rev 960; see, also, Hinds’ Precedents of the House of Representatives, § 2670 et seq.; and § 1655). By a parallel development in the judicial sphere it has served to bolster our Judges’ freedom to act without fear or favor in the furtherance of a "vigorous and independent administration of justice” (Yates v Lansing, 5 Johns 282, 292 [Kent, Ch. J.], affd 9 Johns 395). Instinct in the immunity from suit for libel and *276 slander granted to the ministers of each of these two branches of government, legislators and Judges both, is recognition that the exercise of the responsibilities of those offices requires the making or pronouncement of judgments, the exercise of discretion, the expression and encouragement of even controverted fact and opinion, and the recognition, evolution or enforcement of public policy.[3]
The right of nonjudicial and nonlegislative governmental officials to assert such an immunity is of relatively recent origin. It had its genesis in England in 1895 (Chatterton v Secretary of State of India [1895], 2 QB 189) and was adopted in this country a year later (Spalding v Vilas, 161 US 483 [postmaster general]). Significantly, both cases involved cabinet officers and were based upon the rationale that such highranking officials, "who speak for the government or as its mouthpiece”, formulate and pronounce policy in varying degrees and, therefore, in a broad sense are an embodiment of government itself, should not, while carrying out their official duties,[4] be apprehensive that their motives might become the subject of inquiry in a civil suit (Veeder, Absolute Immunity In Defamation, 10 Col L Rev 131, 141).
In England, the doctrine’s application for the most part continued to be applied to top-level officials whose conduct constitutes an "act of state” (Szalatnay-Stacho v Fink [1947], 1 KB 1), but in the United States it has followed a more checkered jurisprudential course. Our Federal courts, which at first adopted the concept of absolute privilege for the executive branch of Government with great hesitancy, gradually extended the zone of its application to encompass an ever-broadening range of officials. That trend culminated in a variegated group of opinions in a five to four decision noteworthy for the divergence of the views of the members of the court on the public policy to be applied (Barr v Matteo, 360 US 564; see Becht, Absolute Privilege of the Executive in Defamation, 15 Vand L Rev 1127, esp pp 1135-1148; cf. Prosser, Torts [4th ed], § 114, p 783).
In the State courts, except for cases against officials of cabinet rank, the decisions have been divided and often incon *277 sistent. This has led to much judicial and other soul-searching, with most of the commentators in the end arriving at the conclusion that absolute priilege for officials of the executive branch of government should be reserved for only those at its highest echelons (Becht, op. cit., pp 1148-1171; see, also, Restatement, Torts 2d, § 591, and Comments thereto; § 598A; Handler & Klein, Defense of Privilege in Defamation Suits Against Government Executive Officials, 74 Harv L Rev 44, 50, n 24; Gray, Private Wrongs of Public Servants, 47 Cal L Rev 303).
New York has been reluctant to extend the applicability of absolute privilege to cases that would represent a departure from the policies which originally brought the doctrine into being. Thus, we have applied it to a borough president, who, as a member of the Board of Estimate, then New York City’s senior legislstive body, and the elected head of one of the five boroughs which make up that megalopolis, was one of its chief executives (Sheridan v Crisona, 14 NY2d 108) and to members of the New York City Board of Higher Education, which is specifically empowered by statute to "govern and administer” the city’s entire system of colleges (Education Law, § 6202; see, also, Education Law, § 6203; Lombardo v Stoke, 18 NY2d 394). Other courts in our State have granted the benefits of absolute privilege to the State Commissioner of Education, "the chief executive officer of the state system of education” (Education Law, § 305, subd 1); Laurence Univ. v State of New York, 41 AD2d 463), to a town supervisor, the chief executive officer of that unit of government (Town Law, § 29; see, also, County Law, § 150; Duffy v Kipers, 26 AD2d 127) and to members of a city board of education entrusted with authority to administer all the schools within the jurisdiction of its school system (Educaion Law, § 2501 et seq.; Smith v Helbraun 21 AD2d 830).
By way of contrast, only a qualified privilege has been extended to the head of a New York State school for deaf mutes (Hemmens v Nelson, 138 NY 517, 523), to employees, as distinguished from board members, of a board of education (Green v Kinsella, 36 AD2d 677), to a State examiner of accounts (Peeples v State of New York, 179 Misc 272, qualifiedly disapproved in Ward Telecommunications & Computer Servs. v State of New York, 42 NY2d 289 [decided herewith]), and to a high school principal (McAulay v Maloff, 82 Misc 2d 447; see, also, Walker v Best, 107 App Div 304; cf. Restate *278 ment, Torts 2d, § 598A, supporting only a "conditional privilege” for "inferior” State officials). It is interesting that, in Lombardo v Stoke (supra, pp 398-399), while recognizing an absolute immunity for members of the board of higher education, we would not willy-nilly do so for the president of one of its constituent colleges, but thought it better to save that question for another day.[5] That day is now.
This analysis leads us to conclude that, unless an official is a principal executive of State or local government or is entrusted by law with administrative or executive policy-making responsibilities of considerable dimension, policy considerations do not require that he be given an absolute license to defame. The privilege exists to protect those who bear the greatest burdens of government or those to whose official functioning it is essential that they be insulated from the harassment and financial hazards that may accompany suits for damages by the victims of even malicious libels or slanders. This at least serves a recognized public purpose. But to cloak public officers who do not have such a need with the privilege to wrongfully vilify others with impunity while their critics remain fully liable for their own tortious communications, would tend to squelch criticism of government by its citizens while serving no sufficiently countervailing public purpose. After all, the immunity is intended for the welfare of the public and not for governmental employees (cf. Doe v McMillan, 412 US 306, 319-324; Hyman v Press Pub. Co., 199 App Div 609, 611). A less discriminating resort to absolute immunity would remove a desirable "check upon calumny” (Andrews v Gardiner, 224 NY 440, 448 [Cardozo, J.]).
Public officials who are not entitled to the immunizing shield of an absolute privilege are not left without the considerable, albeit incomplete, protections from liability for defamation afforded those who communicate orally or in writing in good faith in the course of the performance of their duties of office. Judge (later Chief Judge) Desmond’s survey of the law of qualified privilege, applicable alike to public officials and to others, makes that clear: "' "A communication made bona fide upon any subject matter in which the party commu *279 nicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, although it contained criminating matter which, without this privilege, would be slanderous and actionable; and this though the duty be not a legal one, but only a moral or social duty of imperfect obligation” ’ (Byam v. Collins, 111 N. Y. 143,150). 'The rule of law that permits such publications grew out of the desirability in the public interest of encouraging a full and fair statement by persons having a legal or moral duty to communicate their knowledge and information about a person in whom they have an interest to another who also has an interest in such person. Such privilege is known as a qualified privilege. It is qualified because it does not extend beyond such statements as the writer makes in the performance of such duty and in good faith believing them to be true’ (Bingham v. Gaynor, 203 N. Y. 27, 31). When defendant’s statements are presumptively privileged the rule is that, in order to render them actionable, it is 'incumbent on the plaintiff to prove that [they were] false and that the defendant was actuated by express malice or actual ill-will. While there are numerous cases in the books in which it is said that as to privileged communications the good faith of the defendant and the existence of actual malice are questions of fact for the jury, the expression must not be misunderstood. Those questions are for the jury only where there is evidence in the case warranting their submission to the jury, and the burden of proof is on the plaintiff (Ashcroft v. Hammond, 197 N. Y. 488, 495-496; see Hemmens v. Nelson, 138 N. Y. 517, 529). Falsity is not sufficient for an inference of malice. ' ''It must be * * * consistent only with a desire to injure the plaintiff to justify * * * [sending] the question of malice to the jury” ’ (Fowles v. Bowen, 30 N. Y. 20, 26; see Loewinthan v. Le Vine, 299 N. Y. 372, 375). 'By actual malice is meant "personal spite or ill will, or culpable recklessness or negligence” ’ (Hoeppner v. Dunkirk Print. Co., 254 N. Y. 95, 106).” (Shapiro v Health Ins. Plan of Greater N. Y, 7 NY2d 56, 60-61.)
Now applying the principles to which we have alluded, we note first that, while Dr. Corey’s role in communicating with the tenure committee no doubt was an important one to the parties involved, and not least of all to himself as acting president and vice-president of the college, neither of his two offices falls within the class of executive positions in our State and local government for whom the extraordinary doctrine of *280 absolute privilege is intended. The State University’s decision-making process is vested in its trustees and Chancellor. It is they who administer our system of higher education at its policy-making level, which embraces even the ultimate determination of whether tenure is to be granted (see Education Law, §§ 354, 355; 8 NYCRR 335.3; cf. Gadzella v Neumaier, 67 Misc 2d 585). Dr. Corey was not carrying out those functions. His actions under scrutiny here were ones undertaken during the discharge of his own official duties (cf. Ward Telecommunications & Computer Servs. v State of New York, 42 NY2d 289, supra [decided herewith]).
Basically, Dr. Corey’s functions are akin to those exercised by the heads of the schools in McAulay v Maloff (82 Misc 2d 447, supra) and Hemmens v Nelson (138 NY 517, supra), to neither of whom the doctrine was found applicable. As Justice Mahoney observed in the course of his dissent at the Appellate Division in the present case, "it is difficult to perceive how the goal of protecting our highest administrative, judicial and legislative officials from undue harassment is advanced by extending the salutary doctrine of absolute privilege tp all presidents of public colleges” (53 AD2d 368, 373). In fact, one would be hard put to rationalize a recognition of absolute immunity for the president of a public college while limiting the presidents of the many outstanding private colleges in our State, with their often broader, more independent and additional responsibilities in fund-raising and policy-making areas, to the significant safeguards of qualified privilege alone (cf. Bounds v Mutual of Omaha Ins. Co., 37 AD2d 1008, 1009).
Indeed, it seems to us that the proliferation of government into more and more activities which in the past had been confined to the private sector militates against any automatic equating of governmental employment with absolute immunity or its ready extension beyond the areas into which it has heretofore been permitted. (See Pecue v West, 233 NY 316, 321; Andrews v Gardiner, 224 NY 440, supra; 1 Seelman, Libel and Slander § 272, p 367.)
However, the claimant’s row will not be one easy for him to hoe. The indication is strong that the communication for which Dr. Stukuls faults Dr. Corey and, therefore, the State, as his employer, was one made in the course of Dr. Corey’s employment. The subject in connection with which the communication presumably was made was one in which Dr. Corey had an official interest, if not a duty. That also may hold true *281 with respect to his personal recommendation, which here was adverse. The letter reading did not take place before a large or disinterested audience, but at a meeting of the small, and perhaps sophisticated, committee of five people, in each of whom a corresponding interest, or duty, resided. In his affidavit, Dr. Corey further asserts that he made an affirmative attempt to narrowly confine the publication of the contents of the letter by exacting a pledge that the committee members would keep the information to themselves, though Dr. Stukuls argues that the inference to be drawm from the apparently unsuccessful attempt at secrecy is that there was a consciousness of wrongdoing.
Furthermore, if the letter was presented as rumor or suspicion rather than as fact, Dr. Stukuls wdll be confronted wdth an additional obstacle.[6] For, as to a defamatory rumor as distinguished from a defamatory fact, mere knowledge or belief that the rumor is false will not necessarily defeat the privilege, provided it was "(a) * * * state[d] * * * as rumor or suspicion and not as fact, and (b) the relation of the parties, the importance of the interests affected and the harm likely to be done make the publication reasonable.” (Restatement, Torts 2d, § 602.) This gives recognition to the fact that "there are occasions on which it may be entirely proper to give information of a rumor or a mere suspicion, as such, without any belief or reason to believe that it represents the truth” (Prosser, Torts [4th ed], § 115, pp 795-796).
Of course, even then, the protection of the privilege wdll still be subject to defeasance by excessive publication (Restatement, Torts 2d, § 604), or by the publication of defamatory matter solely for an improper purpose (id., § 605), including its publication "solely from spite or ill wdll” (id., § 603, Comment a). (See Brewer v Second Baptist Church of Los Angeles, 32 Cal 2d 791, 797 [Traynor, J.]; Prosser, Torts [4th ed], § 115, pp 792-796.) But, in this case, given the undisputed responsibilities of the committee, the relationship which Dr. Stukuls and Dr. Corey each bore to its functioning in this instance and the embarrassment which could ensue if, not having been presented to the committee for whatever it was worth, the rumor, if that it was, were to surface later as fact or rumor, it might be well-nigh impossible for Dr. Stukuls to successfully carry *282 the burden of proving that malice was the one and only cause for the publication. (See Restatement, Torts 2d, § 613, subd [1], par [h].)
On the other hand, on the basis of the allegations in his claim and his affidavit taken as a whole, it cannot be said in advance of discovery that Dr. Stukuls will not be able to raise an issue of fact. That Dr. Corey uttered the defamatory matter before the committee does not necessarily mean that he was doing so to advance its interests. He may have been acting duplicitously while motivated solely by his ill will towards Dr. Stukuls. In fact, at this juncture, we do not know whether Dr. Corey was under a professional obligation to see to it that the letter came to the attention of the committee at all. If, for instance, it was rumor, or known to him or other college authorities to be false or to be no more than a republication of a rumor which previously had been discredited, he may not have had any obligation to communicate; rather, under such circumstances, he may have been under a contrary obligation, that is, not to use such misleading, unreliable or defamatory matter.
It therefore could be found as a fact, after taking into account such things as the college’s practice with regard to communications of that sort, the surreptitious manner in which Dr. Corey communicated it to the committee, his contemporaneous extraction of favorable documents from Dr. Stukuls’ file and such other facts as may be developed on discovery, that Dr. Corey was embarked on but a spiteful course of his own. In short, whether the defamatory matter was presented as rumor would be important, but not necessarily determinative.
Dr. Stukuls should therefore have been given the opportunity to discover the source and contents of the letter; at whose initiative its reading in fact came about; what relationship it bore, if any, to the past circulation of a rumor; what part the revelation of the letter played in the committee’s recommendation and in President Jones’ ultimate decision to recommend against tenure to the university; the statements which accompanied the reading of the letter, including those which tended to characterize it as fact or rumor; the extent of Dr. Corey’s knowledge of its truth or falsity and his efforts, if any, to acquire that information; the practice, if one there was, with regard to the use of such letters in arriving at tenure decisions at the college; the nature of the other documents *283 removed from claimant’s file by Dr. Corey and when and why that was done; whether Dr. Stukuls was confronted with the contents of the letter and afforded an opportunity to respond to it; and such other matters as the Court of Claims in its judgment may deem appropriate.
Accordingly, the order of the Appellate Division should be reversed and the case remitted to the Court of Claims for consideration and disposition of the motion for discovery in accordance with this opinion.

. The claim is brought against the State alone under the doctrine of respondeat superior (cf. Jones v State of New York, 33 NY2d 275; Goodyear Aluminum Prods, v State of New York, 12 AD2d 692).

. Dr. Corey says that he "met” with the committee. Although the dissent refers to his role there as that of a "witness”, that designation, which appears to be taken from a brief of one of the litigants, has no foundation in the record. Nothing indicates that his appearance was testimonial in nature. In any event, no special significance is to be attributed to either characterizaion in the context of this case.

. We are not concerned in this case with auxiliary grants of absolute privilege to others, such as lawyers and witnesses, who occupy other vital places in adjudicatory, and legislative proceedings (see Prosser, Torts [4th ed], § 114, pp 777-779).

. Absolute immunity does not apply to a communication outside an official’s competence (Cheatum v Wehle, 5 NY2d 585, 593).

. Lombardo v Stoke (supra, p 402) reveals that Judge Keating’s comments in his concurring opinion that absolute privilege "should be sparingly extended” was consonant with the views of a majority of that court. Judges Van Voorhis and Burke expressly joined that opinion; Judge Scileppi, by his dissent, evidenced a readiness for even a firmer position against extension.

. The word "rumor” has been well defined as signifying "a flying or popular report, the common talk * * * not the remarks of a single person” (Smith v Moore, 74 Vt 81, 86).