Chandok v.
Klessig

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2009

(Argued: April 12, 2010          Decided: January 13, 2011)

Docket Nos. 09-4120-cv(L), 09-4121-cv(xap)

_____

MEENA CHANDOK, Ph.D.,

Plaintiff-Appellant-
Cross-Appellee,

- v. -

DANIEL F. KLESSIG, Ph.D.,

Defendant-Appellee-
Cross-Appellant.

_____

Before: JACOBS, Chief Judge, KEARSE and CALABRESI, Circuit Judges.

Appeal and cross-appeal from a judgment of the United States District Court for the Northern District of New York that dismissed plaintiff's defamation suit complaining of defendant's statements suggesting that plaintiff was guilty of scientific misconduct and dismissed defendant's counterclaim asserting that plaintiff's bringing of this suit violated New York's statute governing Strategic Lawsuits Against Public Participation, N.Y. Civil Rights Law §§ 70-a et seq. See 648 F.Supp.2d 449 (2009).

Affirmed.

ROBERT C. WEISSFLACH, Buffalo, New York (Harter Secrest & Emery, Buffalo, New York, on the brief), for Plaintiff-Appellant-Cross-Appellee.

S. PAUL BATTAGLIA, Syracuse, New York (Bond, Schoeneck & King, Syracuse, New York, on the brief), for Defendant-Appellee-Cross-Appellant.

KEARSE, Circuit Judge:

Plaintiff Meena Chandok, Ph.D., appeals from so much of a judgment of the United States District Court for the Northern District of New York, Joseph M. Hood, Judge[*], as dismissed her amended complaint ("Amended Complaint" or "complaint") against defendant Daniel F. Klessig, Ph.D., seeking damages for allegedly defamatory statements by Klessig impugning the accuracy and/or veracity of Chandok's reports of the results of her biochemical research. In Chandok v. Klessig, 648 F.Supp.2d 449 (2009) ("Chandok"), the district court granted Klessig's motion for summary judgment dismissing the complaint on the ground that Chandok was a limited-issue public figure and that she failed to adduce clear and convincing evidence from which a jury could reasonably conclude that Klessig had acted with "malice," defined as knowledge of falsity or reckless disregard for the truth. Klessig cross-appeals from so much of the judgment as dismissed his counterclaim alleging that Chandok's bringing of this suit

_____

[*] Honorable Joseph M. Hood, Senior Judge, of the United States District Court for the Eastern District of Kentucky, sitting by designation.

- 2 -

violated New York's statute against Strategic Lawsuits Against Public Participation ("SLAPP"), see N.Y. Civ. Rights Law §§ 70-a, 76-a (McKinney 2009). The district court granted Chandok's motion for summary judgment dismissing the counterclaim on the ground that the anti-SLAPP statute did not apply to the facts of this case.

On appeal, Chandok contends principally that the district court erred in ruling that she was a limited-issue public figure and had not adduced clear and convincing evidence of malice. Klessig, in support of his cross-appeal, contends that the district court erred in interpreting the anti-SLAPP statute. We affirm the dismissal of the counterclaim substantially for the reasons stated by the district court. We also affirm the district court's dismissal of the complaint, but we choose to do so on grounds that are different from those adopted by the district court. We conclude that under New York law, which governs the issues in this diversity action, Klessig's statements were within the scope of the conditional privileges for statements on matters as to which the speaker has a legal or moral obligation to speak or for statements among communicants who share a common interest, and that Chandok did not adduce evidence of fault sufficient to overcome those privileges by a preponderance of the evidence.

## I. BACKGROUND

The following description, of events as to which there is no genuine dispute, is taken largely from Chandok's assertions in her court papers, including her Response to Defendant's Statement of Material Facts on Klessig's motion for summary judgment dismissing her complaint. As to Klessig's motion, we view the record in the light most favorable to Chandok and draw all reasonable inferences in her favor.

### A. The "NOS" Project and the Allegedly Defamatory Statements

Klessig was a senior scientist at, and until May 2003 the president of, the Boyce Thompson Institute for Plant Research ("BTI"), an affiliate of Cornell University in Ithaca, New York. Beginning in the late 1990s, a research team directed by Klessig was focusing on immune response mechanisms in plants and, in particular, on plants' production of nitric oxide (or "NO") to offset attacks by pathogens. NO plays a key role in fighting plant disease.

In the latter part of 2000, BTI hired Chandok, a citizen of India, to be a postdoctoral research associate in Klessig's laboratory. She worked on a project whose goal was to find and purify a nitric oxide synthase ("NOS"), i.e., an enzyme that catalyzes the production of nitric oxide. Chandok contends that from late August 2004 on, Klessig made statements that falsely

- 4 -

impugned the accuracy or veracity of her research on the NOS project.

1. Chandok's Reported Results and the Efforts To Replicate Them

On October 20, 2002, Chandok sent Klessig data indicating that she had identified and isolated the protein responsible for catalyzing NOS-like activity, dubbed "variant P" or "varP," by biochemical means; that she had introduced the cloned NOS gene into E. coli and baculovirus; and that she had performed in vitro experiments that confirmed her findings. She reported that the recombinant protein (i.e., the protein resulting from her genetic engineering and recombination) had NOS activity, a result that would have constituted "a significant breakthrough in the field of plant research" (Amended Complaint ¶ 12).

Chandok's reported results were widely publicized within the plant-biology community. They were described in an article coauthored by Chandok, Klessig, and Drs. A. Jimmy Ytterberg and Klaas J. van Wijk of the Cornell Department of Plant Biology, published in May 2003 in the academic journal Cell. A follow-up article based on the same research, coauthored by Chandok, Klessig, BTI scientist Dr. Sophia K. Ekengren, and Dr. Gregory B. Martin of BTI and the Cornell Department of Plant Pathology, appeared in the Proceedings of the National Academy of Sciences ("PNAS") in May 2004.

Prior to Chandok's report of her discoveries, Klessig had twice applied to the National Institutes of Health ("NIH") for

grants to fund NOS research. Neither application was granted. After Chandok's October 20 report of her findings to Klessig, a revised application, cowritten by Klessig and Chandok, was submitted to NIH on October 25. The materials presented in the new application consisted almost entirely of Chandok's reported data. In mid-2003, Klessig's laboratory received a grant of more than $1 million from NIH to fund further NOS research.

In late March 2004, Chandok--who asserts that her working relationship with Klessig by then had deteriorated because of his demeaning behavior toward her (see Chandok brief on appeal at 11; Amended Complaint ¶ 14)--submitted her resignation from BTI and shortly moved to Maryland. Thereafter, none of the other scientists in Klessig's laboratory were able to replicate the results that Chandok had reported and that were described in the Cell and PNAS articles. In the following months, Klessig called Chandok several times to ask her to return to Ithaca to help replicate her NOS experiments. Chandok declined.

Klessig also tried many times during that period, without success, to reach Chandok by telephone and e-mail to discuss the research. In June 2004, BTI's human resources director Lucy Pola sent an e-mail to Chandok that stated, in part, as follows:

> I know that Dan has been trying to reach you about replicating some of the work you have done (I apologize for not being able to tell you exactly what part). I do know that he is asking if you could come help the 3 postdocs in the lab with the procedure as they are unable to replicate. He understands how tricky this procedure was and feels that with your assistance they would be able to do it. He has indicated that he would pay your travel, lodging etc. if you would be willing to come out and help.

Meena, I know your relationship with Dan is strained and that this may seem like a request that you are uncomfortable with. I also know that you are an excellent scientist and that you understand the importance of being able to replicate results. Please let me know your thoughts on this.

Chandok responded that she "agree[d] that it is important to reproduce results," but stated that

[U]nfortunately, my current commitments are keeping me extremely busy. However, if the situation changes at a future point in time, I shall contact you.

After 10 days with no further word from Chandok, Klessig sent her a letter dated June 18, 2004, by e-mail, fax, and registered mail. The letter stated that, although Klessig continued to "believe [Chandok] did purify an NO synthase protein and that protein is varP (and/or P) or at least that varP is part of the iNOS [i.e., "inducible" NOS] activity," it was, as he had told her repeatedly, "critical that other scientists within, as well as outside[] of[,] our group be able to reproduce your results on the plant iNOS" independently, but that none of BTI's scientists had been able to do so.

Klessig's June 18 letter asked Chandok to return to Ithaca, at BTI's expense, to assist in the reproduction of her results by mid-July, "estimat[ing that] it should take no longer than a week or two to do these experiments and resolve the matter." Klessig stated that "in return for [Chandok's] cooperation in assisting in verification of [her] reported results," he would provide her with strong recommendations for future job applications. He added, inter alia, that

[i]f you fail to respond to this letter in a timely manner, you will leave me with little choice but to assume your results are unverifiable and therefore will force me to take the following actions:

■ I will retract both the Cell and PNAS papers.

■ I will have to contact the INS and retract my April 11, 2002 letter of support for your permanent residency application.

■ I will also have to inform the president of BTI and the government agencies which supported your work (NSF and NIH). A formal inquiry, overseen by NSF and NIH, will ensue.

Chandok's response came in the form of a June 30, 2004 letter from her attorney, addressed to the chairman of BTI's board of directors. The letter stated that Chandok would "not, under any circumstances, again work with or for Dr. Klessig" and characterized Klessig's efforts to contact Chandok as a campaign of "harassment"; that Chandok stood by her research and findings and would welcome any legitimate third-party inquiry; and that if Klessig made the disclosures threatened in his letter, Chandok would consider those statements defamatory and would sue.

Chandok did not return to Ithaca. Throughout the spring and summer of 2004, the scientists working in Klessig's laboratory tried in vain to replicate the results that had been reported by Chandok. On July 26, Klessig received an e-mail from one of his researchers who, after describing various problems encountered in attempts to use Chandok's methods and verify her results, concluded as follows: "All of our findings are contradictory to what Meena recorded in the lab notebook, the patent document, and

- 8 -

her Cell and PNAS papers. I do not think that her experiment data are reliable."

2. <u>Allegedly Defamatory Statements by Klessig</u>

In early August, Klessig discussed Chandok's possible scientific misconduct with BTI's president, David Stern, who began an inquiry. On August 20, Klessig, Stern, Pola, and Martin, one of the coauthors of the <u>PNAS</u> article, met to discuss the Chandok matter. Stern decided to appoint an investigative committee, in accordance with BTI's policy on scientific misconduct, and to consider whether and when to retract the <u>Cell</u> and <u>PNAS</u> papers. It was decided that Klessig would notify NIH and the National Science Foundation ("NSF") of the investigation and that Stern would notify the Department of Health and Human Services' Office of Research Integrity ("ORI"). Because some of Chandok's research had been funded by a federal grant, and her findings were the basis of a subsequent federal grant application, Stern sent ORI a letter dated August 30, 2004, that began as follows:

> As required by 42 C.F.R. §50.103(d), . . . I report the result of an inquiry into possible scientific misconduct on the part of a postdoctoral fellow formerly employed by BTI. The research in question was funded in part by the N.I.H. . . . and some of the data in question were furnished as part of a grant proposal which resulted in the above-mentioned award. My determination is that there is sufficient evidence to proceed with an investigation . . . .

The letter proceeded to summarize that evidence, which included Stern's interviews with BTI scientists who had tried and failed to

replicate Chandok's results and the fact that "Chandok . . . did not readily provide them with key experimental materials."

Klessig sent letters dated August 30, 2004 to NIH and NSF officials stating that for several months his postdoctoral researchers had been attempting to reproduce the NOS results reported by Chandok and had been unsuccessful. Each letter stated that the recent evidence "strongly suggests that she falsified" some of her data.

From late August through mid-September, Klessig prepared and sent to Stern, Pola, and/or Chandok's coauthors of the Cell and PNAS articles drafts of statements to retract those articles. The drafts stated, with slight variations in wording, that members of the Klessig laboratory conducting further experiments had been unable to replicate the results reported in the Cell paper and that that inability suggested that the data on "recombinant variant P" may have been "fabricated by the lead author." The retraction that was eventually "[s]ent to PNAS [on] 9/14/04" by Klessig, Martin, and Ekengren read, in part, as follows:

> Since publication of th[e Cell] paper, other members of the Klessig laboratory have been unable to repeat the results with recombinant variant P. In addition, other discrepancies have come to light that suggest data on the recombinant variant P presented in the Cell paper may have been fabricated by M.R. Chandok-- hence the Cell paper is being retracted.
>
> . . . . For this reason and the fact that we are no longer confident in much of the data in this paper, we hereby retract Chandok et al., 2004. M.R. Chandok does not concur with this retraction. . . . The experiments that produced these data were performed by M.R. Chandok and are now suspect. . . . We deeply regret this incident and sincerely apologize to our colleagues.

- 10 -

A September 17, 2004 e-mail from one <u>PNAS</u> editor to another, stating that Klessig had contacted <u>PNAS</u> about the retractions of the <u>Cell</u> and <u>PNAS</u> articles, said that "[i]t appears the first author, a former post doc in [Klessig's] lab, fabricated the data and spiked the samples to indicate iNOS activity." As this e-mail appears to reflect a communication by Klessig, Chandok imputes the charge of "fabricat[ion]" to Klessig (the "Imputed Statement").

On October 6, 2004, at a conference in Madrid, Spain, on plant disease, attended by many of the leaders in the study of plant pathology, Klessig announced the impending publication of the retractions. His notes in preparation for the conference indicate that he discussed Chandok's work, in part, as follows:

> Since publication of this work in <u>Cell</u> in 2003 several new postdocs have joined our group to study varP or the pathogen-inducible NOS. To date they have <u>not</u> been able to repeat the results with the recombinant variant P that were reported. In addition, other discrepancies have very recently come to light that <u>strongly suggest</u> that the data on the <u>recombinant</u> variant P is [<u>sic</u>] unreliable.

Shortly after the Madrid conference, Klessig sent e-mails to fellow scientists who were interested in NOS research and had made contributions to Klessig's research, informing them that at the conference he had announced the retractions of the <u>Cell</u> and <u>PNAS</u> articles in light of his researchers' inability to replicate or confirm Chandok's reported NOS results.

A November 5, 2004 article in <u>Science</u> magazine reported that the <u>Cell</u> and <u>PNAS</u> articles had been retracted. It quoted Klessig as saying that the data reported in those articles were "shaky" and that it was "important that the rest of the scientific

- 11 -

community not base their research on this [sic] unreliable data that we are no longer confident in."

The BTI Scientific Misconduct Investigation Committee (or "Committee"), appointed by Stern in September 2004, proceeded to consider, inter alia, (a) the futile past efforts of Klessig's researchers to replicate Chandok's results, (b) a March 11, 2005 report of a successful effort by Abgent, a laboratory that Chandok hired to perform experiments using reagents that she furnished, and (c) unsuccessful new efforts by Klessig's laboratory to replicate the results reported by Abgent. In its final report, issued in June 2005, the Committee stated that "[i]t should be noted that the verification by Abgent was not completely independent since Dr. Chandok had supplied the reagents used to perform NOS activity assays," and it found the evidence as a whole inconclusive: "Based on the available evidence, the investigating committee found no conclusive evidence of data alteration or fabrication, but also no conclusive evidence that Dr. Chandok achieved the results reported." The Committee was critical of Chandok's procedures, finding "several egregious breaches of commonly accepted scientific practice by Dr. Chandok," including her "failures to maintain records and to archive research results." It stated that "[t]he inability to recover the most important constructs reported in a high profile publication and the inability to reproduce published results, combined with the absence of corroborating detailed research records was judged to be grounds for good faith suspicion of scientific misconduct."

- 12 -

B.  The Claim, the Counterclaim, and the District Court's Rulings

Chandok commenced the present action against Klessig in August 2005 seeking damages in excess of $75,000 for defamation, alleging, in a single cause of action, that Klessig made numerous false statements as to the accuracy or veracity of her NOS research, thereby causing significant damage to her reputation in the scientific community.  The complaint alleged that those statements were made "out of ill will and spite towards Dr. Chandok" (Amended Complaint ¶ 35) and "with actual and common law malice" (id. ¶ 36); that they were made "[i]n retaliation for [Chandok's] not assisting [Klessig] in continuing his research" (id. ¶ 33); and that "[a]t the time of making these allegations, [Klessig] knew that these statements were untrue and/or recklessly disregarded whether such statements were true" (id. ¶ 35). Although the statements of which Chandok complained were not set out in the complaint, during discovery she specified 23 statements from August 26, 2004, through January 25, 2005, that she claimed were false and defamatory (the "Statements").  These included the statements quoted in Part I.A.2. above, as well as various drafts and preliminary statements sent by Klessig to Stern and Pola, and e-mails from Klessig to other fellow scientists.  See Chandok, 648 F.Supp.2d at 452-55 & nn.3-17 (summarizing each of the 23 Statements).

Klessig, in answer to Chandok's complaint, denied, inter alia, that he had uttered any false statements or any statements

- 13 -

out of spite, ill will, or malice, or with reckless disregard for the truth. (See Amended Answer ¶¶ 33-36). He also

> denie[d] that he uttered any statements that injured plaintiff's reputation except (a) such statements as may have described truthfully and accurately (i) her research, (ii) his and BTI's inability to replicate her test results and to verify the existence of the critical varP expression vectors that plaintiff claimed she had used and (iii) other aspects of her conduct and performance, and (b) such other statements as were and are true and/or privileged and/or otherwise non-actionable.

(Id. ¶ 27.)

In addition, Klessig asserted a counterclaim seeking damages, including costs and attorneys' fees, from Chandok for bringing the present action. The counterclaim alleged that within the meaning of the anti-SLAPP statute, N.Y. Civ. Rights Law § 70-a et seq., Chandok's participation in obtaining federal funds for the NOS project made her a "public applicant" (see id. ¶¶ 60-62); that Klessig had a continuing obligation to ensure that those funds were expended in compliance with federal law and to report suspected misconduct to BTI and ORI (see id. ¶ 64); that Chandok's defamation claim against Klessig was materially related to Klessig's reports and comments on Chandok's use of federal funds in the NOS project (see id. ¶ 63); that her claim was without a substantial basis (see id. ¶ 66), given that she "had actual knowledge that she had falsified data in connection with the NOS project and the results she had claimed to have achieved regarding the claimed NOS activity" (id. ¶ 67); and that her defamation claim therefore "constitute[d] a SLAPP suit in

- 14 -

violation of New York Civil Rights Law §§ 70-a et. seq." (id. ¶ 65).

Following a period of discovery, Klessig moved for summary judgment dismissing Chandok's defamation claim, arguing, inter alia, that several of the Statements of which Chandok complained were neither false nor defamatory because they merely expressed opinions, which were incapable of being proven false and were thus protected by the First Amendment and unactionable under New York law. He also argued that the Statements were part of a public controversy and that Chandok could not prevail because she could not establish that Klessig made any of the Statements with knowledge of falsity or with reckless disregard for the truth; that many of the Statements were "published" only to individuals who helped Klessig write the documents in which the Statements appeared, and publication among coauthors is not actionable under New York law; and that any other Statements he made were absolutely or qualifiedly privileged.

Chandok moved for summary judgment dismissing Klessig's counterclaim. Noting that federal funding was not a prerequisite to NOS research, she contended principally that she was not a "public applicant" within the meaning of the anti-SLAPP statute.

In Chandok, 648 F.Supp.2d 449, the district court granted both sides' motions for summary judgment. With respect to Chandok's complaint, the court stated that

> [t]o establish a claim of defamation under New York law, a Plaintiff must establish 1) that the statement averred was defamatory; 2) that the statement was published by the defendant; 3) that the statement was

communicated to a party who was not the plaintiff; and 4) the resultant injury to the plaintiff.

Id. at 456. The court noted, however, that a person's individual interest in protecting her reputation must be weighed against society's interest in fostering free speech, as reflected in the First Amendment, especially in cases involving public figures and public issues. See id. at 458. Thus, it noted that a public figure cannot prevail on a defamation claim unless, in addition to the above elements, she establishes "with convincing clarity" that the statements were false and that the defendant published the statements with "actual" malice, i.e., "knowledge of falsity or reckless disregard for the truth," id. at 459.

The district court ruled that "Chandok is a limited issue public figure" in the area of plant biology. Id. It noted that there is an international community of plant biologists, see id. at 458-59, and that Chandok admitted that she was "well known within the plant biology community," id. at 459. The court stated that "[s]cientific articles are inherently subject to robust criticism, and for good reason," id. at 458, as the free exchange of ideas is indispensable to the progress of scientific research. The court reasoned that Chandok, as the lead author of the articles publishing her reports of her findings, had "willfully interjected herself into a public controversy by way of creating the very subject of the controversy," id. at 459, and that Klessig's constitutional privilege to speak on the matter thus could not be overcome unless Chandok proved with convincing

- 16 -

clarity that his statements were false and had been made with knowledge of falsity or reckless disregard for the truth.

Although the court found that each of the 23 Statements that Chandok alleged defamed her was "reasonably susceptible to a defamatory meaning," id. at 457, it concluded after reviewing the record that "[i]t is not a reasonable inference" that the reported "inability of numerous scientists to duplicate [Chandok's] result" either "was substantially false or that Dr. Klessig knew that it was false, or certainly that the references to such data were made with reckless disregard for the truth," id. at 459-60; see also id. at 459 n.18 ("In fact, Plaintiff never contends that Defendant's comments that numerous other scientists were unable to duplicate Plaintiff's results are false. Plaintiff does not appear to take issue with the factual portions of the Statements, only with the veracity of Defendant's conclusions as to the implications of those facts--that if numerous other scientists could not replicate the results, the original results must have been fabricated or falsified."). The court concluded as a matter of law that Chandok could not prove falsity or malice by clear and convincing evidence and that Klessig was thus entitled to summary judgment dismissing the complaint.

Turning to Klessig's counterclaim, the district court identified three elements of a claim under the anti-SLAPP statute:

> 1) there must be a public application or petition, 2) the public applicant or permittee of that application must file a lawsuit against a person who is "materially related to any efforts of the defendant to report on, comment on, rule on, challenge or oppose such application or permission," and 3) that

- 17 -

the lawsuit must be, at a minimum, substantially without merit.

Id. at 460 (quoting N.Y. Civ. Rights Law §§ 70, 76). The court concluded that Klessig's counterclaim should be dismissed because the first element was not satisfied:

> The defining aspect of a public application or petition, is that it is a required government process that must be satisfied to perform some other task. See Harfenes v. Sea Gate Assoc., Inc., 167 Misc.2d 647, 647 N.Y.S.2d 329, 331 (Sup.Ct.N.Y.County, 1995). Receipt of a grant may certainly assist in conducting research, but research can proceed without this specific grant. . . . [R]equests for money, without other restrictions, are not public applications. Id. As there is no public application, there can neither be a public applicant nor a commentator to the same. Accordingly, there is no cause of action under the SLAPP statute.

Chandok, 648 F.Supp.2d at 460-61.

This appeal and cross-appeal followed.


## II. DISCUSSION

Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment. See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Burke v. Jacoby, 981 F.2d 1372, 1379 (2d Cir. 1992), cert. denied, 508 U.S. 909 (1993).

- 18 -

We review the grant of summary judgment de novo, drawing all reasonable factual inferences in favor of the party against which judgment was granted. See, e.g., Law Debenture Trust Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 468 (2d Cir. 2010); Konikoff v. Prudential Insurance Co. of America, 234 F.3d 92, 97 (2d Cir. 2000) ("Konikoff"). When both sides have moved for summary judgment, each party's motion is examined on its own merits, and all reasonable inferences are drawn against the party whose motion is under consideration. See, e.g., Law Debenture Trust Co. of New York v. Maverick Tube Corp., 595 F.3d at 468; Schwabenbauer v. Board of Education, 667 F.2d 305, 314 (2d Cir. 1981).

A. Chandok's Appeal

Chandok contends principally that the district court erred in ruling that she was a limited-issue public figure and that her report of her research results was a matter of public concern, the premises that led the court to impose on her an unduly demanding standard of proof, i.e., the burden of proving "actual" malice and of doing so by clear and convincing evidence. She also contends that even if those premises were correct, she presented sufficient evidence to create genuine issues to be tried as to Klessig's knowledge of the truth and/or reckless disregard for the falsity of his Statements. For the reasons that follow, we need not reach the questions of whether Chandok was a limited-issue public figure or whether Klessig's statements concerned a matter of public

interest, for we may affirm on any ground for which there is support in the record, see, e.g., Konikoff, 234 F.3d at 98, and we do so here on a simpler ground. Summary judgment dismissing Chandok's defamation claim was appropriate because whether or not Klessig's Statements constituted speech on an issue of public concern, and whether or not Chandok was a public figure with respect to that issue, the Statements were within the scope of state-law qualified privileges for communications on a matter as to which Klessig had a duty to speak and/or for communications to persons with whom he had a common interest in the subject matter; those privileges cannot be overcome without a showing--by a preponderance of the evidence--of either "actual" malice or common-law malice, i.e., spite or ill will; and Chandok did not adduce evidence sufficient to defeat those privileges even under a preponderance standard.

Historically, a defendant was held strictly liable for defamation. See generally Gertz v. Robert Welch, Inc., 418 U.S. 323, 346 (1974); Chapadeau v. Utica Observer-Dispatch, Inc., 38 N.Y.2d 196, 199, 379 N.Y.S.2d 61, 64 (1975). Under state laws, malice was presumed, i.e., "implied by the law from an intentional [defamatory] publication" even when "the defendant harbored no ill will toward the plaintiff, and honestly believed what he said to be true." W. Prosser, The Law of Torts § 113, at 772 (4th ed. 1971).

Beginning with New York Times Co. v. Sullivan, 376 U.S. 254 (1964), the Supreme Court ruled that the First Amendment of

the United States Constitution limits the reach of state defamation laws insofar as they are applied to speech on matters of public concern. In New York Times, the Court held that "[t]he constitutional guarantees" require that a public official not be allowed to recover damages for a false defamatory statement relating to his official conduct without establishing by clearly convincing proof that the defamatory statement was published with "actual" malice, which the Court defined to mean "with knowledge that it was false or with reckless disregard of whether it was false or not." Id. at 279-80. See also St. Amant v. Thompson, 390 U.S. 727, 731 (1968) (constitutional privilege not overcome unless statement was published while "the defendant in fact entertained serious doubts as to the truth of [the] publication"); Garrison v. Louisiana, 379 U.S. 64, 74 (1964) (not overcome unless published with "[a] high degree of awareness of [the publication's] probable falsity").

In Curtis Publishing Co. v. Butts, 388 U.S. 130 (1967), the Court applied this principle to plaintiffs who were "involved in issues in which the public has a justified and important interest" id. at 134, and who, though not public officials, were "public figures," i.e., persons who "commanded a substantial amount of independent public interest at the time of the publications" because of the positions they held and/or because of their "purposeful activity amounting to a thrusting of [their] personalit[ies] into the 'vortex' of . . . important public controversy," id. at 154-55. See, e.g., Gertz, 418 U.S. at 342,

- 21 -

344-45 (persons "who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures" and are subject to the New York Times Co. standard requiring clear and convincing proof of knowledge of falsity or reckless disregard for the truth).

In Gertz, the Court held that the states "may not," consistent with the First Amendment, "permit recovery of presumed or punitive damages" without a showing that the defendant was at fault, 418 U.S. at 349, by a private individual who is involved in an issue of significant public interest, id. at 347; see Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 751 (1985) (plurality opinion) ("Dun & Bradstreet") ("Gertz . . . held that the First Amendment restricted the damages that a private individual could obtain from a publisher for a libel that involved a matter of public concern.").

In Dun & Bradstreet, the Court noted that speech on matters that are of purely private concern is of less First Amendment importance. It ruled that state laws may, without violating the First Amendment, permit recovery for "presumed and punitive damages" in a defamation action without "a showing of 'actual malice' . . . when the defamatory statements do not involve matters of public concern." Id. at 763 (plurality opinion).

For purposes of this opinion, we assume, without deciding, that Klessig's Statements did not deal with a matter of public

concern, that Chandok was not a limited-issue public figure, and that, therefore, the onerous burden of proving "actual," i.e., constitutional, malice by clear and convincing evidence was not applicable. We nonetheless conclude that summary judgment was properly granted dismissing her claims because the evidence she adduced was insufficient to meet the less demanding standards imposed in these circumstances by New York law.

New York law allows a plaintiff to recover for defamation by proving that the defendant published to a third party a defamatory statement of fact that was false, was made with the applicable level of fault, and either was defamatory per se or caused the plaintiff special harm, so long as the statement was not protected by privilege. See, e.g., Albert v. Loksen, 239 F.3d 256, 265-66 (2d Cir. 2001), and authorities cited therein. But New York "[p]ublic policy mandates that certain communications, although defamatory, cannot serve as the basis for the imposition of liability in a defamation action." Toker v. Pollak, 44 N.Y.2d 211, 218, 405 N.Y.S.2d 1, 4 (1978). New York law accords qualified privileges to at least two categories of statements that are pertinent to the present case.

A statement is generally "subject to a qualified privilege when it is fairly made by a person in the discharge of some public or private duty, legal or moral." Rosenberg v. MetLife, Inc., 8 N.Y.3d 359, 365, 834 N.Y.S.2d 494, 497 (2007) ("Rosenberg") (internal quotation marks omitted); see, e.g., Stukuls v. State, 42 N.Y.2d 272, 279, 397 N.Y.S.2d 740, 744 (1977) ("Stukuls")

- 23 -

(this privilege applies "though the duty be not a legal one, but only a moral or social duty of imperfect obligation" (internal quotation marks omitted)). For example, a letter from a physician who believed his assistant had stolen patient files, to "an official body charged with responsibility for consideration and processing of complaints of professional misconduct on the part of physician's assistants," was "subject at a minimum to [this] qualified privilege." Buckley v. Litman, 57 N.Y.2d 516, 520, 457 N.Y.S.2d 221, 222 (1982) ("Buckley").

In addition, a "qualified[] privilege extends to a communication made by one person to another upon a subject in which both have an interest." Liberman v. Gelstein, 80 N.Y.2d 429, 437, 590 N.Y.S.2d 857, 862 (1992) ("Liberman") (internal quotation marks omitted); see, e.g., Buckley, 57 N.Y.2d at 520-21, 457 N.Y.S.2d at 222-23. This privilege encompasses a defamatory communication on "any subject matter in which the party communicating has an interest . . . made to a person having a corresponding interest." Stukuls, 42 N.Y.2d at 278-79, 397 N.Y.S.2d at 744 (emphases and internal quotation marks omitted). In some instances the common-interest privilege may overlap the moral-duty privilege, for one may have a "moral duty to communicate . . . knowledge and information about a person in whom the[ speaker] ha[s] an interest to another who also has an interest in such person," id. at 279, 397 N.Y.S.2d at 744 (internal quotation marks omitted). Thus, in Buckley, Dr. Litman, the physician who believed his assistant had stolen patient files,

- 24 -

had a qualified privilege for communicating that information to a fellow physician who had handled the practice of Dr. Litman while the latter was away and with whom the assistant was seeking employment. See 57 N.Y.2d at 520-21, 457 N.Y.S.2d at 222-23.

A qualified privilege may be overcome by a showing either of "actual" malice (i.e., knowledge of the statement's falsity or reckless disregard as to whether it was false) or of common-law malice. See, e.g., Liberman, 80 N.Y.2d at 438, 590 N.Y.S.2d at 863; Rosenberg, 8 N.Y.3d at 365, 834 N.Y.S.2d at 497. Common-law malice "mean[s] spite or ill will." Liberman, 80 N.Y.2d at 437, 590 N.Y.S.2d at 862. "The critical difference between common-law malice and constitutional [i.e., "actual"] malice . . . is that the former focuses on the defendant's attitude toward the plaintiff, the latter on the defendant's attitude toward the truth." Konikoff, 234 F.3d at 99.

As for what is needed to prove "actual" malice, "there is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action." Liberman, 80 N.Y.2d at 438, 590 N.Y.S.2d at 863; see also Gertz, 418 U.S. at 334 n.6 (equating reckless disregard with "'serious doubts as to the truth'" and "subjective awareness of probable falsity" (quoting St. Amant, 390 U.S. at 731)).

Further, while either "actual" malice or common-law malice "will suffice to defeat a conditional privilege," Liberman, 80 N.Y.2d at 438, 590 N.Y.S.2d at 863, common-law malice will defeat

- 25 -

such a privilege only if it was "'the one and only cause for the publication,'" id. at 439, 590 N.Y.S.2d at 863 (quoting Stukuls, 42 N.Y.2d at 282, 397 N.Y.S.2d at 746); see, e.g., Albert v. Loksen, 239 F.3d at 272 (same); Konikoff, 234 F.3d at 98 (same). Thus, as to common-law malice, "only if a jury could reasonably conclude that" spite or ill will "'was the one and only cause for the publication'" is "a triable issue . . . raised." Liberman, 80 N.Y.2d at 439, 590 N.Y.S.2d at 863 (quoting Stukuls, 42 N.Y.2d at 282, 397 N.Y.S.2d at 746).

"Unlike situations in which the 'actual malice' standard is constitutionally imposed and must therefore be proved by 'clear and convincing' evidence, . . . to defeat qualified privilege in New York, the plaintiff need only establish 'actual malice' by a preponderance of the evidence." Albert v. Loksen, 239 F.3d at 273. Preponderance is the normal quantum of proof applicable in civil cases, and none of the New York cases discussed above suggests that more than a preponderance is required to establish common-law malice.

Within this framework, we conclude that all of Klessig's Statements were protected by one or more state-law privileges. Several were subject to qualified privileges for statements that Klessig had a legal and/or moral obligation to make. As to legal obligations, the fact that some of the NOS research was funded by federal moneys meant that Klessig was required to inform the pertinent agencies of suspicions of scientific misconduct. Federal regulations defined "[m]isconduct" or "[m]isconduct in

- 26 -

[s]cience" to include "fabrication," "falsification," and "other practices that seriously deviate from those that are commonly accepted within the scientific community for . . . conducting or reporting research," 42 C.F.R. § 50.102 (2003), and they required that any entity applying for a research grant establish procedures "for investigating and reporting instances of alleged or apparent misconduct involving research . . . or research activities that are supported with funds made available under the [Public Health Service] Act," id. § 50.101 (emphases added). Thus, when Klessig wrote to officials of NIH and NSF stating that "[e]vidence [had] recently emerged that strongly suggests that [Chandok] falsified" some, most, or all of her reported data on recombinant varP, he was fulfilling a legal obligation. Similarly, when Klessig formally filed his allegations against Chandok with the Scientific Misconduct Investigation Committee, he was complying with the reporting requirement, for the regulations required an immediate inquiry and/or investigation into allegations of possible misconduct, see id. §§ 50.101, 50.103(d). Accordingly, in making his Statements to the Committee, NIH, and NSF, Klessig was acting in accordance with a legal duty.

Moreover, in light of the facts that Klessig had twice applied to NIH for, and twice failed to be awarded, federal funds for his NOS research, and that NIH granted Klessig's laboratory funds (in excess of $1 million) for NOS research only after receiving his third application, which was cowritten by Chandok and consisted almost exclusively of Chandok's reported data, we

conclude that even had there been no federal reporting regulations, Klessig would have had a moral obligation to inform NIH of the possible fabrication of the data on which, clearly, it had relied.

Further, Klessig plainly had a moral obligation to share his concerns about Chandok's reported results with BTI's president Stern, with BTI's responsible personnel officer Pola, with the Cell and PNAS articles' coauthors Ekengren, who was a BTI scientist, and Martin, Ytterberg, and van Wijk, who were members of the faculty at Cornell. The reputations and credibility of both institutions and all of these individual scientists were imperiled by the fact that they were explicitly associated with scientific articles that may have been predicated on fabricated research results or fraudulent reporting. The moral-obligation qualified privilege applies to at least the nine Statements sent to one or more of these BTI and Cornell recipients. Indeed, several of these Statements were merely drafts of the retraction statements that were to be sent to Cell and PNAS by the respective articles' coauthors other than Chandok.

We note also that Klessig's Imputed Statement to the PNAS editor and the formal retraction sent to PNAS too fell within the qualified privilege for statements that Klessig had a moral obligation to make. Having caused PNAS to publish the article, and having developed serious doubts about the accuracy or veracity of its contents, Klessig and his coauthors who shared those doubts rightly felt that they owed it to PNAS--and to any

fellow scientist who might otherwise base his or her research on those reported data--to make known their views of the Cell and PNAS articles' unreliability.

Finally, many of Klessig's Statements were within the scope of the New York qualified privilege for statements on a matter of common interest among communicants. His Statements to Stern, Pola, Ekengren, Martin, Ytterberg, and van Wijk, discussed above, in addition to being within the moral-obligation privilege, were within the common-interest privilege. The remaining eight Statements of which Chandok complains were e-mails sent by Klessig to fellow scientists, at Cornell or other institutions, who shared his interest in NOS research, and some of whom had made contributions to Klessig's research. In these e-mails, Klessig stated that his researchers had been unable to reproduce Chandok's reported results, and he warned his fellow scientists that that inability and other recent evidence "strongly suggest that the data on the recombinant varP," reported in the 2003 Cell article, were "unreliable" or "falsified" or "may have been fabricated" or "had to be falsified because [Chandok] could not have made the protein," or that Klessig had come to believe that she "[n]ever had the recombinant version." As communications to colleagues with whom he had a common interest in NOS research, these e-mailed statements too were qualifiedly privileged.

Thus, all of Klessig's Statements were privileged under New York law in the absence of a showing by Chandok that they were motivated by "actual" or common-law malice.

- 29 -

As to "actual" malice, the record does not contain evidence from which a rational juror could find by a preponderance of the evidence either that Klessig knew the Statements were false or that he acted in reckless disregard for the truth. For months, Klessig had at least three scientists attempting to replicate Chandok's reported results; it is undisputed that they failed. Although Chandok argues that the experiments were difficult and opines that those scientists were simply less able than she, that opinion, even if warranted, is plainly insufficient to permit a jury to find that Klessig acted in reckless disregard of the truth. The Scientific Misconduct Investigation Committee found that Chandok's record-keeping practices with respect to her research results were egregious, hampering the duplication of her reported efforts and the confirmation of her reported findings. Klessig repeatedly importuned Chandok to return to Ithaca to help replicate her results; it is undisputed that she refused. In light of (a) Chandok's acknowledgement that it was important to be able to replicate reported scientific results, (b) the lack of any dispute as to the fact that other scientists were unable independently to replicate or confirm Chandok's reported results, (c) the undisputed fact that Klessig repeatedly attempted to discuss the research with Chandok and repeatedly implored her to assist his researchers, (d) the undisputed fact that Chandok refused to assist in their efforts, and (e) the absence of corroborating details in Chandok's records of her research, no rational juror could find that Klessig's Statements with regard to

the retraction of the Cell and PNAS articles on the ground that Chandok's reported results were "suspect," "unreliable," and "may have been fabricated," were made either with knowledge that the Statements were false or with reckless disregard for their truth.

Nor does the record permit an inference of common-law malice. In light of the efforts made by Klessig to have the results reported by Chandok replicated, including his repeated requests that she visit Ithaca to help in the replication effort, and given the importance of NOS research, the need for independent verification of important scientific announcements, and the stakes of the various institutions and individual scientists in their reputations as collaborators in the publication of Chandok's unverifiable reported results, no rational juror could conclude that Klessig's Statements were made solely out of spite and ill will.

We conclude that Chandok failed to adduce evidence of either "actual" or common-law malice sufficient to create a genuine issue for trial. Summary judgment dismissing her complaint was properly granted.

B. Klessig's Counterclaim

Klessig contends that Chandok's present action constitutes a SLAPP suit, arguing that her participation in the application to NIH for federal funding for NOS research made her a "public applicant" within the meaning of the anti-SLAPP statute. That statute provides, in part, that

[a] defendant in an action involving public petition and participation, as defined in paragraph (a) of subdivision one of section seventy-six-a of this article, may maintain a[] . . . counterclaim to recover damages, including costs and attorney's fees, from any person who commenced or continued such action,

N.Y. Civ. Rights Law § 70-a(1), if that action was

commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law,

id. § 70-a(1)(a). Section 76-a defines "[a]n 'action involving public petition and participation,'" in pertinent part, as "an action . . . for damages that is brought by a public applicant or permittee." Id. § 76-a(1)(a). The statute defines "public applicant or permittee" as

any person who has applied for or obtained a permit, zoning change, lease, license, certificate or other entitlement for use or permission to act from any government body, or any person with an interest, connection or affiliation with such person that is materially related to such application or permission.

Id. § 76-a(1)(b) (emphases added).

The district court ruled that Klessig's counterclaim should be dismissed on the ground that Chandok was not a public applicant or permittee because government permission or support was not a prerequisite to her NOS research. We agree.

The New York Court of Appeals has noted that the enactment of the anti-SLAPP statute in 1992 was prompted by

a rising concern about the use of civil litigation, primarily defamation suits, to intimidate or silence those who speak out at public meetings against proposed land use development and other activities requiring approval of public boards. Termed SLAPP suits--strategic lawsuits against public

- 32 -

> participation--such actions are characterized as having little legal merit but are filed nonetheless to burden opponents with legal defense costs and the threat of liability and to discourage those who might wish to speak out in the future . . . .

600 West 115th Street Corp. v. Von Gutfeld, 80 N.Y.2d 130, 137 n.1, 589 N.Y.S.2d 825, 828 n.1 (1992). Accordingly, noting that the anti-SLAPP statute was

> specifically designed to protect those citizens who, usually before a government agency, publicly <u>challenge applications by developers or other</u> <u>businesses for environmental and land use permits,</u> <u>leases, licenses or other approvals</u>,

Harfenes v. Sea Gate Association, Inc., 167 Misc.2d 647, 650, 647 N.Y.S.2d 329, 331 (Sup. Ct. N.Y. Co. 1995) (emphasis added), the Harfenes court held that a homeowners' association that had sought a loan from the Small Business Administration had not thereby become a public applicant within the meaning of the statute. The court reasoned that an application for a government loan was not an application for an "'entitlement for use or permission to act from [a] government body,'" id. at 653, 647 N.Y.S.2d at 333.

Uniformly, the New York courts have found that the persons properly alleged to be public applicants within the meaning of the anti-SLAPP statute were persons whose proposed actions required government permission. See, e.g., Novosiadlyi v. James, 70 A.D.3d 793, 793-94, 894 N.Y.S.2d 521, 522 (2d Dep't 2010) (building use permit was required); Singh v. Sukhram, 56 A.D.3d 187, 194, 866 N.Y.S.2d 267, 274 (2d Dep't 2008) (permission to operate an airline was required); Related Properties, Inc. v. Town Board, 22 A.D.3d 587, 588-89, 591, 802 N.Y.S.2d 221, 222-23,

225 (2d Dep't 2005) (land use permit was required); Duane Reade, Inc. v. Clark, 2004 WL 690191, at *7 (N.Y. Sup. Ct. N.Y. Co. Mar. 31, 2004) ("permit process" of the New York City Department of Buildings "was a prerequisite to the activity carried out by the plaintiff to which the defendant Clark was opposed"); Street Beat Sportswear, Inc. v. National Mobilization Against Sweatshops, 182 Misc.2d 447, 452, 698 N.Y.S.2d 820, 824 (N.Y. Sup. Ct. N.Y. Co. 1999) (apparel manufacturer "c[ould] only operate its business with the permission of the Labor Commissioner").

We are aware of no case that has held the New York anti-SLAPP statute applicable to a person who is entitled to engage in her proposed course of conduct without government permission or to a person who merely sought government funding for a project that could be financed privately.

In light of the language and intent of the statute, and the New York courts' interpretations of it, we conclude that Klessig's counterclaim was properly dismissed.

CONCLUSION

We have considered all of the parties' arguments in support of their respective appeals and have found in them no basis for reversal. The judgment of the district court is affirmed.

Plaintiff shall bear the costs of the appeal; defendant shall bear the costs of the cross-appeal.